UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

CHRISTOPHER FRENCH,        )
                                  )
              Plaintiff        )
                                  )
v.                                  )     Docket No.  1:18-cv-00073-JCN
                                  )
DANIEL MERRILL, et al,        )
                                  )
             Defendants    )

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
## WITH INCORPORATED MEMORANDUM OF LAW

Pursuant to Fed. R. Civ. P. 56, Defendants move for summary judgment as to all of Plaintiff's claims. As set forth below and in the Stipulated Facts and accompanying Statement of Undisputed Material Facts ("SMF"), Defendants contend that there are no genuine issues of material fact precluding this Court from entering summary judgment in favor of Defendants.

## INTRODUCTION

This case arises out of Plaintiff's arrest by Orono police officers on two separate occasions. Plaintiff was arrested on February 19, 2016 by Defendants Drost and Merrill for harassment and he was arrested on September 14, 2016 by Defendants Morse and Gray for burglary. The Complaint alleges state law and constitutional claims against the individual defendants, as well as supervisory and municipal liability claims against the Chief of Police and the Town of Orono. Defendants move for summary judgment as to the entirety of Plaintiff's Second Amended Complaint (Doc No. 6) (the "Complaint"),[1] and will address Plaintiff's claims in the following order: (1) the claims against Drost and Merrill relating to the February incident; (2) the claims against Morse and Gray arising

---

[1] Plaintiff, through counsel, has advised that he is not pursuing Count V, a state law claim for Abuse of Process against Officers Drost and Merrill.

out of the September incident; (3) the supervisory and municipal liability claims; and (4) the claims for punitive damages. The undisputed background facts common to Plaintiff's claims are set forth immediately below; additional undisputed facts relevant to each incident are presented in the discussion of each claim.

## BACKGROUND FACTS

As of February 2016, Plaintiff and Samantha Nardone were both students at the University of Maine at Orono and had been dating since the fall of 2013. Stipulated Facts, (ECF Doc. No. 34) ("SF") ¶ 8. At all times material to this case, Ms. Nardone lived at 60 Park Street in Orono, Maine and Plaintiff lived at 13 Park Street in Orono, which is approximately .2 of a mile, or about a five minute walk, from Ms. Nardone's residence. SF ¶¶ 6-7.

At all times material to this case, Defendant Ewing was the Chief of Police for the Town of Orono Police Department. ¶ 5. At all times material to this case, Defendant Merrill was a sergeant and Defendants Drost, Morse, and Gray were patrol officers for the Town of Orono Police Department. SF ¶¶ 1-4. At all times relevant to this case, the individual defendants were certified by the State of Maine to work as law enforcement officers. SMF ¶¶ 254-57, 274.

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits. . . show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is "material" if it "has the potential to change the outcome of the suit." *Tropigas de Puerto Rico, Inc. v. Certain Underwriters of Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011) (parallel quotation omitted). An issue is "genuine" if "a reasonable jury could resolve the point in favor of the nonmoving party." *Id*. The facts are viewed in the light most favorable to the non-moving party and the court draws all reasonable inferences in favor of the non-moving party. *Fed.*

*Ins. Co. v. Commerce, Inc. Co.*, 597 F.3d 68, 70 (1st Cir. 2010).  However, "[o]nce the moving

party has pointed to the absence of adequate evidence supporting the nonmoving party's case, the

onus is on the nonmoving party to present facts that show a genuine issue for trial." *Napier v. Town

of Windham*, 187 F.3d 177, 182 (1st Cir. 1999).

## ARGUMENT

### I.    OFFICER DROST AND SGT. MERRILL ARE ENTITLED TO SUMMARY JUDGMENT FOR THE FEBRUARY INCIDENT

Plaintiff asserts the following claims arising out of his arrest on February 19, 2016: a claim

under 42 U.S.C. § 1983 against Defendants Drost and Merrill for an unlawful arrest in violation of

his Fourth Amendment rights (Count I); § 1983 claims against Drost for violations of his Eighth

Amendment (Count II) and procedural Due Process rights (Count III); and a state law tort claim of

false imprisonment against Drost and Merrill (Count IV).

#### A.  Relevant Facts for the February 2016 Incident

As of February 18, 2016, Ms. Nardone lived at 60 Park Street with two roommates, Drew

White and Alicia McDonald. SF ¶ 9. In the early morning hours of February 18, 2016, Officer

Drost, along with Sgt. Merrill and Officer Haass responded to Ms. Nardone's residence because a

neighbor had called the police reporting a family fight.[2] SF ¶ 10. Upon arrival at the scene, the

officers interviewed Ms. Nardone and her two roommates, as well as Plaintiff. SMF ¶¶ 4-7. Ms.

Nardone and her roommates reported that Plaintiff was refusing to leave their residence. SMF ¶ 11.

Although Ms. Nardone wanted Plaintiff to leave that evening, she did not want to press charges.

SMF ¶ 19, 21. Officer Drost ordered Plaintiff to leave and he complied. SMF ¶ 32. As he was

walking away from Ms. Nardone's residence towards his own residence down the street, Plaintiff

immediately texted Ms. Nardone saying "Fuck u cunt piece of shit" and saying that "it's over fuck

---

[2] Officer Haass is not a defendant in this action.

your self you selfish piece of shit". SMF ¶¶ 33-35; SF ¶ 12. After receiving these messages, Ms. Nardone showed them to Officer Drost, who then advised her about a cease harassment notice. SMF ¶¶ 33-36. Ms. Nardone asked Officer Drost to issue the notice to Plaintiff because she feared Plaintiff would continue to harass her. SMF ¶ 37. Officer Drost filled out the Orono Police Department cease harassment notice and served it on Plaintiff at approximately 1:51 am on February 18, 2016. SMF ¶ 39; SF ¶ 13. Sgt. Merrill explained to Plaintiff that he needed to stop harassing Ms. Nardone. SMF ¶ 41. While Plaintiff refused to sign the acknowledgement of receipt, there is no dispute that he, in fact, received it and understood what it was. SMF ¶¶ 43-44.

Later that evening, Officer Drost learned from Ms. Nardone that, less than an hour after being issued the cease harassment notice, Plaintiff began bombarding her with electronic communications. SMF ¶¶ 50, 56. Although she did not respond to any messages, Ms. Nardone told Officer Drost that Plaintiff kept sending her messages on multiple platforms, including via text message, Snapchat, Instagram, and email. SMF ¶¶ 55, 57, 60. Ms. Nardone told Officer Drost that she was afraid and agreed to come into the police station to meet with Officer Drost so he could investigate further. SMF ¶ 52.

Ms. Nardone took screen shots of these communications from Plaintiff and provided them to Officer Drost, SMF ¶ 59; SF ¶ 21, including a message to Ms. Nardone at 2:23 am, after being served with the cease harassment notice, where Plaintiff wrote "It's over I've cheated . . ." SMF ¶ 61. In another message, Plaintiff wrote "I'm killin myself hope you feel better about yourself expect to be at my funeral next week."  SMF ¶ 62. Plaintiff sent emails to Ms. Nardone later that night including one at 6:52 pm asking "How could you be so mean to me all I want to do is talk about last night how could you be so heartless I don't get you." SMF ¶ 64. Plaintiff sent more emails to Ms. Nardone, one at 7:37 pm stating: "I take it nows a bad time to drop your things off" and another at 7:38 pm telling her he was dropping her stuff off. SMF ¶ 65. Plaintiff continued to email her that

4

night: at 10:54 pm he sent Ms. Nardone an email asking "Where r u," SMF ¶ 66, and at 11:38 pm, Plaintiff sent Ms. Nardone an email stating "I will find u.," SMF ¶ 67. Ms. Nardone described Plaintiff's actions toward her as harassment and that it "terrified" her.  SMF ¶ 57.

Ms. Nardone also told Officer Drost that Plaintiff kept calling her from a blocked number. SMF ¶ 50. She also learned that Plaintiff had showed up at her class at the University of Maine and described that Plaintiff had "stalked" the room where she was scheduled to attend a meeting. SMF ¶ 51, 68. Ms. Nardone told Officer Drost that, as a result, she had to find an alternative route to leave. SMF ¶ 69. Plaintiff then later showed up when she was in a local business parking lot. SMF ¶ 70. Ms. Nardone filled out a witness statement detailing this information. SMF ¶ 54; SF ¶ 19.  It was clear to Sgt. Merrill that Ms. Nardone was having her life impacted by Plaintiff's constant attempts to contact her to the point where she was afraid for her safety. SMF ¶ 72. During the interview, Ms. Nardone told Officer Drost and Sgt. Merrill that she felt like she should just transfer from the university. SMF ¶ 73.

Based on the information provided by Ms. Nardone, Officer Drost had probable cause to believe that Plaintiff had, without reasonable cause, engaged in a course of conduct with the intent to harass, torment or threaten Ms. Nardone after he had been served with the cease harassment notice. SMF ¶ 74. Officer Drost then decided to arrange for Ms. Nardone to initiate a pre-textual text or call with Plaintiff so that he could arrest Plaintiff for harassment. SF ¶ 22; SMF ¶ 79. Ms. Nardone asked Plaintiff to meet her at her residence and he agreed to do so. SMF ¶ 80. Officer Drost went with Ms. Nardone to her residence and waited out of sight for Plaintiff to arrive. SMF ¶¶ 81-82. Upon arrival, Officer Drost arrested Plaintiff for harassment. SMF ¶ 83.

### B.  Drost and Merrill had Probable Cause to Arrest Plaintiff for Harassment

Plaintiff cannot establish liability against Defendants Drost and Merrill for a Fourth Amendment violation under 42 U.S.C. § 1983 for an unlawful arrest. The Fourth Amendment protects

the right of the people to be free from unreasonable seizures.  U.S. Const. amend. IV. A warrantless arrest is reasonable "where there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford,* 543 U.S. 146, 152 (2004).  A Fourth Amendment violation actionable under § 1983 for an unlawful arrest therefore requires a showing that the officer lacked probable cause to make the arrest.  *See Correia v. Feeney*, 620 F.3d 9, 12 (1st Cir. 2010); *Roche v. John Hancock Mut. Life Ins. Co.*, 81 F.3d 249, 254 (1st Cir. 1996).  Probable cause to arrest exists where "at the moment of the arrest, the facts and circumstances within the relevant actors' knowledge and of which they had reasonably reliable information were adequate to warrant a prudent person in believing that the object of his suspicions had perpetrated or was poised to perpetrate an offense." *Roche*, 81 F.3d at 254 (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). Probable cause is "not a high bar" and "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity."  *D.C. v. Wesby*, 138 S.Ct. 577, 586, 199 L. Ed. 2d 453 (2018) (citations omitted); *see also United States v. Rivera*, 825 F.3d 59, 63 (1st Cir. 2016) (noting that probable cause "does not demand certainty, or proof beyond a reasonable doubt, or even proof by a preponderance of the evidence"). In considering "whether an officer had probable cause for an arrest, 'we examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause.' " *Wesby*, 138 S.Ct. at 586 (quoting *Maryland v. Pringle*, 540 U.S. 366, 371, 124 S.Ct. 795 (2003)).

Plaintiff was arrested by Officer Drost for harassment of Ms. Nardone.[3] Under Maine law, a person is guilty of harassment if, without reasonable cause, the person "engages in any course of conduct with the intent to harass, torment or threaten another person" after having been notified, in writing or otherwise, not to engage in such conduct by a police officer. 17-A M.R.S.A. § 506-

---

[3] Plaintiff was also charged with criminal OUI (refusal), driving without a license, and a civil violation for possessing a false identification, but those charges arose after the seizure challenged here. SMF ¶ 88. It is undisputed that Plaintiff was arrested at Ms. Nardone's residence for harassment.  SMF ¶¶ 84-85.

A(1)(A)(1)(a). Maine law provides that a law enforcement officer may arrest a person without a warrant if the officer has probable cause to believe that the person has committed or is committing harassment as set forth in Section 506-A. 17-A M.R.S.A. § 15(1)(A)(12). Here, there is no dispute that Officer Drost issued a cease harassment notice to Plaintiff on February 18, 2016 for the benefit of the complainant, Ms. Nardone. SF ¶ 13. The cease harassment notice tracked the language of the statute.

Based on the undisputed facts discussed above, Drost and Merrill had probable cause to believe that Plaintiff had committed the crime of harassment. It is undisputed that Plaintiff had been notified by Drost and Merrill not to engage in the very conduct that he continued to carry out in the early morning, and throughout the day and evening of February 19, 2016. SMF ¶¶ 39-42. The conduct that led to the cease harassment notice was the series of vulgar text messages in which Plaintiff called Ms. Nardone a "cunt" and a "selfish piece of shit." Shortly after being warned to stop this conduct, Plaintiff started messaging her on multiple platforms, SF ¶ 12, telling her he cheated, SMF ¶ 61, threatening to commit suicide, SMF ¶ 62, calling her heartless, SMF ¶ 64, and then later trying to locate her and claiming that he would find her, SMF ¶¶ 66-67. Officer Drost and Sgt. Merrill interviewed the victim, Ms. Nardone, and had her write out a witness statement, which required her to swear to the truth of her statements. Ms. Nardone described not only Plaintiff's conduct towards her, but also the effect it had on her, including that it terrified her and was harassing. In determining probable cause, it was reasonable for Officer Drost to justifiably rely on the credible information from Ms. Nardone. *Holder v. Town Of Sandown*, 585 F.3d 500, 505 (1st Cir. 2009); *United States v. Barbosa*, 896 F.3d 60, 70 (1st Cir. 2018) (citing *B.C.R. Transp. Co. v. Fontaine*, 727 F.2d 7, 10 (1st Cir. 1984) ("[P]robable cause determinations predicated on information furnished by a victim are generally considered to be reliable."). In addition, Officer Drost reviewed the communications from Plaintiff to Ms. Nardone and obtained copies of those

communications, so he was able to evaluate firsthand Plaintiff's course of conduct.[4] Officer Drost and Sgt. Merrill were not required to rule out Plaintiff's explanations for his harassing messages before finding probable cause. Even assuming Plaintiff truly was only trying to make up with Ms. Nardone and return her property, this alone does not vitiate probable cause. Probable cause "does not require officers to rule out a suspect's innocent explanation for suspicious facts." *Wesby*, 138 S. Ct. at 588; *see Cox v. Hainey*, 391 F.3d 25, 32 n.2 (1st Cir. 2004) ("A reasonable police officer is not required to credit a suspect's story."). At the moment of Plaintiff's arrest, Officer Drost and Sgt. Merrill had enough reasonably reliable information to conclude there was a substantial chance that Plaintiff had committed the offense of harassment. Since Plaintiff's arrest was supported by probable cause, his Fourth Amendment claim for an unlawful seizure fails.

### C.  Drost and Merrill are Entitled to Qualified Immunity on the Fourth Amendment Unlawful Arrest Claim

Even if Officer Drost and Sgt. Merrill were mistaken in their belief that probable cause existed to arrest Plaintiff for harassment, they are nevertheless entitled to qualified immunity. Qualified immunity "shields government officials performing discretionary functions from liability for civil damages 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *See Estate of Bennett v. Wainwright*, 548 F.3d 155, 167 (1st Cir. 2008).  A police officer's conduct "violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)); *see also White v. Pauly*, 137 S. Ct. 548, 551(2017).  For purposes of qualified immunity, "the operative inquiry is not

---

[4] The term "course of conduct" is not defined in the harassment statute. There is a definition provided under the stalking statute: "Course of conduct" "means 2 or more acts, including but not limited to acts in which the actor, by any action, method, device or means, directly or indirectly follows, monitors, tracks, observes, surveils, threatens, harasses or communicates to or about a person or interferes with a person's property. . . . " 17-A M.R.S.A. § 210-A(2)(A).

whether the defendant's actions actually abridged some constitutional right . . . but, rather, whether those actions were obviously inconsistent with that right." *Cox*, 391 F.3d at 31 (citations omitted). Here, "in the case of a warrantless arrest, if the presence of probable cause is arguable or subject to legitimate question, qualified immunity will attach." *Id.*

In the context of probable cause, the Supreme Court has recognized that, "[g]iven its imprecise natures, officers will often find it difficult to know how the general standard of probable cause applies in 'the precise situation encountered." *Wesby*, 138 S.Ct. at 590 (citation omitted). Here, even assuming the officers lacked actual probable cause, a reasonable officer under the circumstances confronted by Drost and Merrill reasonably would have concluded that the course of conduct of Plaintiff, including the plethora of messages, showing up at Ms. Nardone's class, and calls that were blocked, provided probable cause to arrest Plaintiff for harassment.

Plaintiff asserts that the officers lacked probable cause to arrest him for harassment because he had "reasonable cause" to send Ms. Nardone all those communications. Complaint ¶¶ 28, 36. Plaintiff insists that he was incessantly messaging Ms. Nardone because that was how their relationship worked – they would get into a fight and then make-up the following day and this had always worked in the past – and he was trying to return her property to her. Complaint ¶ 36; SMF ¶¶ 100-01. While the absence of "reasonable cause" is one of the elements of the crime of harassment, Drost determined from the attendant circumstances that Plaintiff lacked reasonable cause. Even viewing the record in the light most favorable to Plaintiff and assuming that some of Plaintiff's messages were only to make up or arrange to return her property, that explanation does not provide "reasonable cause" for the messages where he threatens to kill himself, calls Ms. Nardone heartless, and stalked her meeting at school. While some of Plaintiff's communications to Ms. Nardone, taken in isolation, may be susceptible to an innocent explanation, their cumulative effect, along with his other behavior (*e.g.* showing up at her class), supports the conclusion that there was a probability or substantial chance that

Plaintiff was harassing Ms. Nardone. *See United States v. Flores*, 888 F.3d 537, 544–45 (1st Cir. 2018).  As Ms. Nardone stated:  "All the harassing terrifies me . . . ." SMF ¶ 71.  As noted above, Drost and Merrill were not required to rule out Plaintiff's innocent explanations before reaching a reasonable conclusion that probable cause existed. *Id.* An objectively reasonable officer could conclude that Plaintiff had no reasonable cause for his behavior, regardless of whether or not he had a legitimate explanation for some of the messages in that he was attempting to return Ms. Nardone's belongings.

Similarly, Plaintiff asserts that because he had no subjective intent to harass, torment or threaten Ms. Nardone, the lack of the requisite *mens rea* negates probable cause. Complaint ¶¶ 41, 43. However, the First Circuit has recognized that wide latitude must be afforded police officers with respect to ascertaining intent. *Cox*, 391 F.3d. at 33-34 ("[T]he practical restraints on police in the field are greater with respect to ascertaining intent and, therefore, the latitude accorded to officers considering the probable cause issue in the context of *mens rea* crimes must be correspondingly great.").  In most situations, a suspect's state of mind must be ascertained from his or her conduct. Here, Plaintiff was served with the cease harassment notice immediately after sending Ms. Nardone five text messages, including messages calling her a "cunt" and a "selfish piece of shit." Merrill told Plaintiff he had to stop harassing Ms. Nardone, citing to that behavior. The undisputed fact that less than an hour later, Plaintiff started messaging her saying "it's over," and that he was killing himself, demonstrates complete disregard to heed the warning from Sgt. Merrill and the clear language of the cease harassment notice. Based on the further barrage of communications on numerous platforms including email, Instagram, and SnapChat, as well as Plaintiff showing up at Ms. Nardone's class, it was reasonable for the officers to infer from his behavior that Plaintiff had the requisite intent to harass and torment Ms. Nardone. Plaintiff's apparent claim that alternative, innocent inferences could have been made from the information provided by Ms. Nardone to the officers "does not prevent a finding

of probable cause so long as the inference upon which the officer relies is reasonable." *Cox*, 391 F.3d at 32–33. Even if Drost and Merrill were mistaken with respect to Plaintiff's actual intent, when viewing Plaintiff's behavior following the receipt of the cease harassment notice objectively, a reasonable officer could conclude that the requisite *mens rea* for harassment was present. Drost and Merrill must therefore be afforded qualified immunity.

In addition, based on the circumstances of this case, the law was not clearly established that Plaintiff's behavior was insufficient to support a finding of probable cause that he had committed the crime of harassment. There is limited case law in this context, but on at least one occasion, this Court has found far milder conduct sufficient to establish probable cause for harassment. In *Williams v. Reed*, the Court concluded that a deputy had probable cause for issuing a summons and complaint to Williams for harassment where, after he was served with a cease harassment notice, Williams violated the notice by sending a letter to the people whom he was accused of harassing. W*illiams v. Reed*, No. 1:16-CV-0211-DBH, 2017 WL 3203394, at *1, n.1 (D. Me. July 26, 2017). While *Williams* was decided after Plaintiff's arrest here and is not sufficient to clearly establish law for purposes of qualified immunity, it is still informative in that it shows the range of conduct that could support probable cause for the crime of harassment. A single communication in *Williams* was sufficient to constitute harassment. Defense counsel could find no Supreme Court or Circuit case law that would have given Drost and Merrill fair and clear warning that probable cause was wholly lacking under these circumstances. Without such notice, and because probable cause was at the very least arguable, Defendants Drost and Merrill must be afforded qualified immunity.

### D.  Officer Drost is Entitled to Summary Judgment on Plaintiff's Eighth Amendment Claim

In Count II, Plaintiff alleges that Officer Drost violated Plaintiff's Eighth Amendment right not to be subject to excessive bail by allegedly providing false and misleading information to the

bail commissioner for the purpose of ensuring that the bail commissioner would not admit Plaintiff to bail.  Complaint ¶¶ 115-17. The undisputed record shows that Plaintiff was arrested at approximately 12:28 am on February 19, 2016. SF ¶ 29. Plaintiff appeared before a Superior Court Justice in the afternoon of February 19, 2016, at which point bail was set at approximately 4:00 pm and he was released from custody that same day. SMF ¶¶ 96-98. Plaintiff was in custody for a total of approximately 18 hours. SMF ¶ 99.

> ### i. There is No Evidence that Officer Drost Provided False and Misleading Information to the Bail Commissioner

While Plaintiff's Eighth Amendment claim is framed as one of excessive bail, Plaintiff does not challenge the amount of bail. Rather, Plaintiff's claim against Officer Drost is based on alleged conduct that Plaintiff contends led to the denial of bail by a bail commissioner. Assuming for the moment that these allegations implicate the Eighth Amendment, which is not entirely clear, as discussed *infra*, Officer Drost is entitled to summary judgment because the record does not support this claim. There is no evidence that Officer Drost provided false or misleading information to the bail commissioner.  Officer Drost recommended to the bail commissioner that Plaintiff not immediately be bailed. SMF ¶ 90-91. Officer Drost's recommendation was based on his concern that if Plaintiff was immediately bailed, he would return to Ms. Nardone's residence or continue to harass her. SMF ¶ 90-92. Officer Drost described the events leading to Plaintiff's arrest, including behavior that Officer Drost and the bail commissioner described as harassing/stalking. SMF ¶ 91. Plaintiff apparently claims that describing Plaintiff's behavior toward Ms. Nardone as "stalking" was false and misleading because he was not being charged with the offense of stalking. However, there is no evidence that Officer Drost falsely told the bail commissioner that Plaintiff was being charged with stalking. Given the conduct that had occurred on February 19, 2016, it was not misleading for Officer Drost to describe Plaintiff's behavior as stalking, even if he was not

criminally charged with that crime. Ms. Nardone had described Plaintiff's behavior using the term "stalking." SMF ¶ 68. There is no evidence in the record to suggest that Officer Drost intentionally misled the bail commissioner by using that terminology.

Relevant here, under Maine law stalking occurs when a person "intentionally or knowingly engages in a course of conduct directed at or concerning a specific person that would cause a reasonable person: (1) [t]o suffer serious inconvenience or emotional distress; or (2) [t]o fear bodily injury . . . ." 17-A M.R.S.A. § 210-A(1)(A). A course of conduct is defined as "2 or more acts, including but not limited to acts in which the actor, by any action, method, device or means, directly or indirectly follows, monitors, tracks, observes, surveils, threatens, harasses or communicates to or about a person or interferes with a person's property." *Id.* § 210-A(2)(A). Plaintiff had clearly engaged in a course of conduct by communicating with Ms. Nardone greater than two times and had showed up at her class. Based on the recorded interview of Ms. Nardone, it was reasonable for Officer Drost to conclude that Ms. Nardone was suffering serious inconvenience as a result of Plaintiff's actions. At one point during the interview, she even said she was going to transfer schools. SMF ¶ 73. She also expressed that she was afraid of Plaintiff more than once, telling police that he "terrifies" her. Based on this, it was not misleading for Officer Drost to describe Plaintiff's behavior as harassing/stalking.

There is no evidence in the record that Officer Drost falsely told the bail commissioner that he had arrested Plaintiff for the crime of stalking. The mere fact that he used that term to describe Plaintiff's behavior is insufficient to demonstrate that Officer Drost intentionally made a false statement to, or mislead the bail commissioner. Even assuming the allegations in Count II could implicate the Eighth Amendment, there is no evidence in the record from which a reasonable jury could infer that Officer Drost made false or misleading statements to the bail commissioner.

## ii.    Officer Drost is Entitled to Qualified Immunity

Officer Drost is entitled to qualified immunity as to Plaintiff's Eighth Amendment claim. Plaintiff cannot make out a violation of a clearly established constitutional right based on these allegations. The Eighth Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel or unusual punishment inflicted. U.S. Const. amend. VIII. While Plaintiff's claim is framed as one of excessive bail, his claim is really grounded on conduct by the officer that he alleges led to the denial of bail by a bail commissioner. However, there is no absolute right to bail under the Constitution. *See United States v. Salerno*, 481 U.S. 739, 752–53, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). While the Constitution prohibits excessive bail, the Eighth Amendment "says nothing about whether bail shall be available at all." *Id.* Nor does the Constitution address the timing of the bail determination. Here, while Plaintiff was initially denied bail by the bail commissioner, he was admitted to bail later that same day. SMF ¶¶ 96-98. Plaintiff does not challenge the amount of bail that was ultimately set. There is no constitutional requirement that a criminal defendant be admitted to bail by a bail commissioner. The fact that Plaintiff was admitted to bail the same day he was arrested and does not challenge the amount of bail precludes his claim being grounded in the Eighth Amendment.

Even if the conduct complained of could make out a violation of the Eighth Amendment, this was not clearly established at the time of Officer Drost's alleged conduct. Although the First Circuit has held that a police officer who "help[ed] to shape, and exercis[ed] significant influence over, the bail decision" can be liable under 42 U.S.C. § 1983 for excessive bail that results, *Wagenmann v. Adams*, 829 F.2d 196, 212 (1st Cir.1987), that decision does not support Plaintiff's claim against Officer Drost because here, no excessive bail was imposed. In *Wagenmann*, the claim was that the bail set was excessive, not that bail was denied by a bail commissioner to allow it to be determined by a judge later the same day. *Wagenmann*, a single case from 1987 that has never been

endorsed by the Supreme Court, could not provide fair and clear notice that the specific conduct Officer Drost is alleged to have committed is unlawful, particularly where the record demonstrates that Officer Drost merely communicated the underlying behavior of Plaintiff. *Cf. Carroll v. Carman*, 574 U.S. 13, 135 S. Ct. 348, 350, 190 L. Ed. 2d 311 (2014) (reversing Third Circuit where it cited to only a single case to support its decision to deny officer qualified immunity).

Based on undersigned counsel's research, the Supreme Court has never addressed whether an officer providing allegedly false and misleading information to a bail commissioner constitutes a violation of the Eighth Amendment's prohibition on excessive bail, when the arrestee was released later the same day. Officer Drost could not have been on notice that his recommendation to the bail commissioner that bail be denied, based on his accurate recitation of the events leading to arrest, violated protections afforded by the Eighth Amendment. Even viewing the record in the light most favorable to Plaintiff, whether his allegations even set forth a violation of the Eighth Amendment is far from clear. As a result, Officer Drost is entitled to qualified immunity.

### E.  Officer Drost is Entitled to Summary Judgment on Plaintiff's Fourteenth Amendment Due Process Claim

#### i.    Plaintiff's Claim Does Not Implicate the Fourteenth Amendment and the Post-Arrest Detention Did Not Offend the Fourth Amendment

Similar to his Eighth Amendment claim, in Count III, Plaintiff alleges that, by providing the bail commissioner with allegedly false and misleading information about Plaintiff in order to have the bail commissioner deny bail, Officer Drost deprived Plaintiff of his liberty interest guaranteed by the Due Process Clause of the Fourteenth Amendment. The Due Process Clause of the Fourteenth Amendment prohibits a state from depriving a person of "life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. It is undisputed that even though the bail commissioner initially denied Plaintiff bail, Plaintiff was seen before a judge later that day and released on bail. SMF ¶ 98. The alleged deprivation of liberty at issue here is therefore Plaintiff's

detention from the time the bail commissioner denied Plaintiff bail until he was released later that day. Plaintiff claims that this detention amounted to a violation of his Fourteenth Amendment due process rights. Defendants contend that this claim fails to implicate the Fourteenth Amendment and instead should be analyzed under the Fourth Amendment.

Plaintiff's claim is grounded in the allegation that Officer Drost caused his unlawful, continued seizure. This claim is appropriately analyzed under the Fourth Amendment. The Supreme Court has held that the Fourth Amendment governs a challenge to the post-arrest deprivation of liberty interests, not the Fourteenth Amendment. *See Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911, 917-20, 197 L. Ed. 2d 312 (2017) ("This Court decided some four decades ago that a claim challenging pretrial detention fell within the scope of the Fourth Amendment."). In *Manuel*, the arrestee challenged the detention period only *after* the onset of legal process; the arrestee treated the period of time between his warrantless arrest and his first appearance in court "as part and parcel of the initial unlawful arrest." *Id.* at 916, n.3. Unlike in *Manuel*, Plaintiff is challenging the time period immediately following his arrest. However, *Manuel* is still instructive in that, in reviewing its prior decisions addressing constitutional challenges to pretrial detention, it concluded that the Fourth Amendment "provides the appropriate lens through which to view a claim involving pretrial detention." *Id*. at 918. In its discussion, the *Manuel* Court also explained that "[p]retrial detention can violate the Fourth Amendment not only when it precedes, but also when it follows, the start of legal process in a criminal case." *Id*. The holding in *Manual* can fairly be applied to Plaintiff's claim challenging his post-arrest deprivation of liberty. Therefore the Fourth Amendment, not the Fourteenth Amendment, governs this claim.

This claim is essentially a continuation of Plaintiff's Fourth Amendment claim against Officer Drost for an unlawful arrest. But because, as discussed *supra*, Officer Drost had probable cause for the arrest, the real issue for this claim is whether Officer Drost's continued detention of

Plaintiff was objectively unreasonable. Assuming for a moment that the record supported the inference that Officer Drost misled the bail commissioner, the question is whether Plaintiff's detention after his arrest, but before his release later that day, conforms with the requirements of the Fourth Amendment. Based on the circumstances and because he was released the same day of his arrest, Plaintiff's post-arrest detention was objectively reasonable.

The Supreme Court has explained that the Fourth Amendment was "tailored explicitly for the criminal justice system, and it[ ] always has been thought to define" the appropriate process "for seizures of person[s] ... in criminal cases, including the detention of suspects pending trial." *Gerstein v. Pugh*, 420 U.S. 103, 125, n.27, 95 S. Ct. 854, 869, 43 L. Ed. 2d 54 (1975). The Fourth Amendment, "standing alone, guaranteed 'a fair and reliable determination of probable cause as a condition for any significant pretrial restraint.'" *Manuel*, 137 S. Ct. at 917 (citing *Gerstein*, at 125, 95 S.Ct. 854). In *County of Riverside v. McLaughlin*, 500 U.S. 44, 47, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991), the Supreme Court considered how quickly a jurisdiction must provide a probable-cause determination. The Supreme Court "left it to the individual States to integrate prompt probable cause determinations into their differing systems of pretrial procedures." *Id.* at 53, 111 S.Ct. 1661 (citing *Gerstein*, 420 U.S. at 123–24, 95 S.Ct. 854)). However, the *McLaughlin* Court stated that "a jurisdiction that provides judicial determinations of probable cause within 48 hours of arrest will, as a general matter, comply with the promptness requirement of *Gerstein*." *Id.* at 56, 111 S.Ct. 1661.

First, in light of *Gerstein* and *McLaughlin*, Plaintiff falls short of demonstrating that the refusal to be bailed immediately following his arrest was objectively unreasonable. Being admitted to bail by a bail commissioner immediately after an arrest is not constitutionally required. The Supreme Court has required that, unless there are extraordinary circumstances, a probable cause hearing be held within 48 hours of the arrest. Here, Plaintiff had a court appearance and was released less than 24 hours after he was arrested. Plaintiff's detention for 18 hours did not come

close to the presumptively unreasonable 48 hour rule. Second, Officer Drost had reason to believe that if Plaintiff was immediately bailed, he would return to Ms. Nardone's residence or continue to harass her. Based on the information known to him, Officer Drost's recommendation that bail be denied initially until Plaintiff could be seen by a judge was objectively reasonable. Given the totality of the circumstances, Defendant Drost's recommendation to deny bail and Plaintiff's post-arrest detention were not objectively unreasonable.[5]

### ii.   Officer Drost is Entitled to Qualified Immunity on the Post-Arrest Detention Claim

Regardless of whether Plaintiff's claim is properly treated as one arising under the Fourth or Fourteenth Amendment, the right he seeks to vindicate was not clearly established. It would not be clear to every reasonable officer in Drost's position that his conduct was unlawful in the situation he confronted. For the reasons discussed above, Officer Drost had probable cause to arrest Plaintiff for harassment. The fact that Plaintiff was detained and then released on bail 18 hours later may have been inconvenient, but it did not violate any clearly established right under the Fourth or Fourteenth Amendment. There is no constitutional prohibition on recommending the denial of bail, particularly when, as here, the officer had reason to believe that the arrestee would continue the harassing behavior. There is no evidence that Officer Drost made false or misleading statements to the bail commissioner. *See supra* Section I(D)(i), Given the information known to Officer Drost, it would not be clear to every reasonable officer in Officer Drost's position that he was prohibited from describing Plaintiff's behavior as harassing/stalking behavior to the bail commissioner. Given

---

[5] To the extent Plaintiff contends that Officer Drost's actions violated the standards and processes of the Maine Bail Code or the Maine Constitution, Complaint ¶¶ 123-24, this does not support his claim under § 1983. A claim brought pursuant to § 1983 must be premised on a denial of rights secured by the Constitution or a federal statute. *See Garcia-Gonzalez v. Puig-Morales*, 761 F.3d 81, 87 (1st Cir. 2014). Plaintiff's claims are brought pursuant to 42 U.S.C. § 1983. Complaint ¶ 127. An alleged violation of state law is therefore insufficient for his § 1983 claim.

*Gerstein* and *McLaughlin*, it would not have been clear to an officer in Drost's position, that detaining Plaintiff for 18 hours following his arrest would violate his constitutional rights.

### iii.    Plaintiff Has an Adequate State Law Remedy

Even if this Court were to recognize a Fourteenth Amendment right on these allegations, Plaintiff's procedural due process claim fails because Plaintiff had an adequate post-deprivation remedy under state law.  *See Reid v. New Hampshire*, 56 F.3d 332, 341 (1st Cir.1995) ("[A] procedural due process claim may not be redressed under section 1983 where an adequate state remedy exists."). Even assuming that Defendant Drost can be held responsible for the bail commissioner's independent decision to deny Plaintiff bail, Plaintiff was seen by a judge later that same day and released on bail. Any grievance that Plaintiff had because of the bail commissioner's decision was adequately addressed when he was brought before a judge and released that same day. There is also a state law remedy for Plaintiff's grievance based on his alleged improperly prolonged detention. Maine law recognizes an actionable tort claim for false imprisonment, and Plaintiff is pursuing this claim in this lawsuit. In Count IV, Plaintiff asserts a state law false imprisonment claim against Officer Drost, in part, based on his alleged denial of Plaintiff's "proper and impartial consideration of eligibility for bail" and the allegation that Officer Drost "prolonged the unlawful and false imprisonment" of Plaintiff. Complaint ¶ 130. Because there is an adequate state law remedy, Plaintiff is precluded from pursuing his procedural due process claim.

### F.  Defendants are Immune Under the Maine Tort Claims Act

As discussed fully above, since the seizure of Plaintiff by Officer Drost was supported by probable cause, Plaintiff's state law tort of false imprisonment against Drost and Merrill fails as a matter of law. Even assuming that Plaintiff could establish that Defendants Drost and Merrill lacked probable cause, Defendants are entitled to immunity under the Maine Tort Claims Act ("MTCA")  *See* 14 M.R.S.A. §§ 8101, *et seq.*  Governmental employees are entitled to personal immunity under the

MTCA from civil liability for "performing or failing to perform any discretionary function or duty . . . ." 14 M.R.S.A. §8111(1)(C).  This is true "whether or not the discretion is abused; and whether or not any statute, charter, ordinance, order, resolution, rule or resolve under which the discretionary function or duty is performed is valid."  *Id.*  The MTCA also confers absolute immunity on governmental employees for intentional acts or omissions that arise in the course and scope of their employment.  14 M.R.S.A. § 8111(1)(E).  The only exception to the grant of immunity under Section 8111(1)(E) is for intentional acts performed in "bad faith."  *Id.*

Defendants are entitled to qualified immunity under the MTCA, whether the alleged acts are considered discretionary or intentional. Because Plaintiff's state law tort claim arises out of his arrest, the disposition of Plaintiff's section 1983 claim informs the disposition of Plaintiff's claim under the MTCA.  *See Berube v. Conley*, 506 F.3d 79, 85–86 (1st Cir. 2007).  Unless the evidence could reasonably be construed to show that the conduct underlying Plaintiff's claims, "was so egregious as to clearly exceed any discretion" the officers had, they are entitled to immunity.  *See Dimmitt v. Ockenfels*, 220 F.R.D. 116, 125 (D. Me. 2004).  As discussed fully above, Drost and Merrill reached a reasonable conclusion, based on their interview with Ms. Nardone and the copies of the communications, that there was probable cause that Plaintiff was harassing her. They were therefore authorized under Maine law to arrest him. There is no evidence in the record that would allow a reasonable factfinder to conclude that the conduct of the Drost and Merrill was so egregious that it falls outside the scope of immunity provided by state law." *See Berube*, 506 F.3d at 85–86.  Similarly, Drost's recommendation that Plaintiff be seen by a judge, based on his legitimate concerns for the safety of the terrified victim of Plaintiff's harassment, cannot support a finding of bad faith that would cause a loss of his intentional conduct immunity.

II.    **OFFICERS MORSE AND GRAY ARE ENTITLED TO SUMMARY JUDGMENT FOR THE SEPTEMBER INCIDENT**

Plaintiff asserts, pursuant to 42 U.S.C. § 1983, violations of his Fourth, Fifth, and Sixth Amendment rights arising out of his interactions with Officers Morse and Gray on September 14, 2016. Plaintiff's § 1983 claims do not challenge the lawfulness of his arrest for burglary on September 14, 2016. Plaintiff also does not assert any state law tort claims against Officers Gray and Morse.

### A.  Relevant Facts for the September 2016 Incident

On September 14, 2016 at approximately 3:19 am, Officers Morse and Gray were dispatched to Ms. Nardone's residence at 60 Park Street for a burglary complaint. SMF ¶¶ 104-105; SF ¶¶ 30, 33. Officer Morse was generally familiar with Ms. Nardone because she had an interaction with the Orono Police earlier in the year relating to a complaint against Plaintiff. SMF ¶ 107. Officer Morse was also familiar with Plaintiff and knew where he lived because he had been involved in a prior incident when Plaintiff was arrested by Officer Barrieau for violating his conditions of release. SMF ¶ 108-09.

In order to investigate the burglary complaint, Officer Morse and Gray interviewed Ms. Nardone and her roommate, Alicia McDonald, and received sworn statements from them. SMF ¶ 110; SF ¶¶ 37-38. Officers Morse and Gray learned that Ms. McDonald and Ms. Nardone had been out on the evening of September 13, 2016, when a person, later identified as Plaintiff, ran into the street towards Ms. Nardone's vehicle, and started swearing at Ms. Nardone, asking where she had been. SMF ¶¶ 111-16. The officers learned that Ms. Nardone and Plaintiff had recently broken up. SMF ¶ 112. Ms. Nardone told the officers that as she tried to drive away, Plaintiff jumped on her vehicle. SMF ¶ 117. Ms. Nardone was able to drive away and returned to 60 Park Street, but she

and Ms. McDonald were scared that Plaintiff was going to come to their house so they locked all the doors and windows. SMF ¶ 118.

Ms. Nardone started receiving multiple First Class (University of Maine) emails from Plaintiff. SMF ¶ 119. Ms. McDonald told Ms. Nardone to ignore the messages and placed Ms. Nardone's phone on the night stand by her bed. SMF ¶ 120. Ms. Nardone told the officers that she locked her bedroom door and then fell asleep around 12:30 am. SMF ¶ 121. Ms. Nardone woke up at approximately 3:00 am and her phone was missing. SMF ¶ 123. Ms. McDonald suspected that Plaintiff had broken in through a sliding door. SMF ¶ 126. Ms. Nardone also informed the officers that Plaintiff had taken her keys last week and still had them and had also broken into her residence in the past and taken items without her knowledge, including her laptop. SMF ¶¶ 127-28.

Officer Gray contacted dispatch to inquire with the cell phone carrier about "pinging" Ms. Nardone's cell phone in order to try to determine its location. SMF ¶ 129. Officer Morse discussed the ping of the cell phone with Officer Gray and Det. Fearon and Officer Orr of the Old Town Police Department, who had arrived to assist given the serious nature of the call, and they discussed the possibility of conducting a "knock and talk" to see if Plaintiff would voluntarily speak with them. SMF ¶¶ 130-31. When Officer Morse had driven by Plaintiff's building at 13 Park Street while responding to 60 Park Street, there were lights in Plaintiff's building, which led Officer Morse to believe that the occupants were awake. SMF ¶ 132. Officer Morse spoke with dispatch and was advised of the information required to request a ping from the cellular phone carrier, which included the subscriber's information and signature. SMF ¶ 133. Ms. Nardone was on her mother's cell phone plan, so she called her mother for the necessary information and an authorization to ping the phone. SMF ¶¶ 134-35. Ms. McDonald subsequently received the information from Ms. Nardone's mother and emailed it to Officer Morse. SMF ¶ 136. Before the officers left 60 Park Street, Officer Morse asked Ms. Nardone and Ms. McDonald if they felt safe staying at the

residence. SMF ¶ 139. Ms. Nardone told the officers that if Plaintiff accessed her cell phone, then she would not feel safe. SMF ¶ 140. Ms. Nardone described her phone as a gold iPhone with a cracked screen. SMF ¶ 142.

Officers Morse and Gray left 60 Park Street and returned to the Orono Police station and planned on requesting the ping of Ms. Nardone's phone from the cell phone carrier. SMF ¶ 144-45. If the ping indicated that the phone was located at Plaintiff's residence, then Officer Morse planned on applying for a search warrant to search for Ms. Nardone's phone at Plaintiff's residence. SMF ¶ 146. However, shortly after returning to the station, the officers received another call from dispatch reporting that Plaintiff was seen at Ms. Nardone's residence. SMF ¶ 147. Morse and Gray quickly left the Orono Police station and drove towards 60 Park Street, but dispatch advised that Plaintiff had left 60 Park Street and was seen running down the road in the direction of his residence at 13 Park Street. SMF ¶¶ 148-49. As discussed further below, Morse and Gray stopped at 13 Park Street to see if they could locate Plaintiff, but they did not see or otherwise make contact with him at that time.  SMF ¶ 150-52; SF ¶ 41.

Morse and Gray left Plaintiff's property and decided that Gray would stay near 13 Park Street while Morse would go to 60 Park Street to speak further with Ms. Nardone. SMF ¶¶ 154-55; SF ¶¶ 42-42. Officer Gray knocked again on Plaintiff's front door. SMF ¶ 158, Meanwhile, Officer Morse drove to 60 Park Street and spoke with Ms. Nardone, who told him that Plaintiff had entered her doorway into the mudroom. SMF ¶ 161. Shortly thereafter, Officer Morse left 60 Park Street and returned to the general area of 13 Park Street. SF ¶ 45.

After observing 13 Park Street for a while, Officer Morse eventually met up with Officer Gray and Det. Fearon in the general area of 15-17 Park Street. SMF ¶ 173. Since Morse had been inside 13 Park Street before, he showed Fearon and Gray where Plaintiff's bedroom was located – on the first floor on the left side of the building bordering the driveway of 15 Park Street. SMF ¶¶

175, 180.  As discussed further below, Det. Fearon and Officer Morse attempted to contact Plaintiff

at his bedroom window, but no one responded. *See* SMF ¶¶ 184-88. After seeing that the officers

received no response at the window, Officer Gray walked to the front door, walked onto the porch,

and started knocking on the front door of the building. SMF ¶ 189. Plaintiff's roommate, Corey

Andrews, answered the front door and agreed to get Plaintiff. SMF ¶ 191-93; SF ¶ 46. A few

minutes later, Plaintiff came to the front door, stepped outside of the building, and closed the door

behind him. SMF ¶ 195; SF ¶ 47.

Officers Morse and Gray asked Plaintiff about what he was doing at Ms. Nardone's

residence and about her cell phone. SMF ¶¶ 197-202. Plaintiff denied having her phone, but agreed

to go look in his house for it. SMF ¶ 206. As Plaintiff went towards the front door, Det. Fearon

informed Plaintiff that for officer safety reasons, Plaintiff was not allowed to go back into the

residence without being accompanied by an officer. SMF ¶ 215. Plaintiff refused to allow any

officers permission to enter his residence. SMF ¶ 216. Det. Fearon suggested that Plaintiff have his

roommate go get the cell phone and Plaintiff agreed. SMF ¶ 217. Corey looked for the phone and

eventually returned with an iPhone that matched the description of Ms. Nardone's phone. SMF ¶¶

219-226. Officers Morse and Gray asked Plaintiff to explain how he came into possession of Ms.

Nardone's phone. SMF ¶ 227. Plaintiff denied entering Ms. Nardone's residence and said that he

saw the cell phone and her birth control on the ground near her house, so he picked it up and took it.

SMF ¶ 228, 230. After disbelieving Plaintiff's explanation, and based on the information provided

by Ms. Nardone and Ms. McDonald, and the fact that he had Ms. Nardone's cell phone in his

possession, the officers placed Plaintiff under arrest for burglary. SMF ¶ 231.

**B.  Officers Morse and Gray are Entitled to Summary Judgment on Plaintiff's Fourth Amendment Claim**

In Count IX, Plaintiff alleges that Officers Morse and Gray violated his Fourth Amendment rights on September 14, 2016. The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. As noted above, Plaintiff's Fourth Amendment claim against Officers Morse and Gray is not based on an unlawful seizure, *i.e.* his arrest for burglary. *See* Complaint, Count IX. Rather, Plaintiff's claim is based on the officers' warrantless entry into the curtilage of his residence. Complaint ¶¶ 157-59. Plaintiff contends that Officers Morse and Gray violated his Fourth Amendment rights when they entered the curtilage of his residence without a warrant and knocked on his door and window. Complaint ¶¶ 157-58. Plaintiff also contends that his Fourth Amendment rights were violated when the Officers allegedly coerced one of the occupants to require Plaintiff to present himself. *Id.*

The Supreme Court has long recognized that the curtilage – the area "immediately surrounding and associated with the home" – enjoys Fourth Amendment protection. *See Oliver v. United States*, 466 U.S. 170, 180, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984). However, the Supreme Court has also concluded, that "a police officer not armed with a warrant may approach a home and knock . . . ." *Fla. v. Jardines*, 569 U.S. 1, 8, 133 S. Ct. 1409, 1415–16 (2013) (citation omitted). Courts have recognized that the "knock and talk" is a permissible investigatory tool that permits a police officer to make a warrantless entry onto private property and knock for legitimate police purposes, such as gathering information in an investigation or locating a suspect. *Id. See also United States v. Henry*, 827 F.3d 16, 20, n.3 (1st Cir. 2016) (A "knock and talk" occurs when police officers approach a residence without a search warrant, and "seek[ ] to speak to an occupant for the purpose of gathering evidence.") (citation omitted).

Here, Officers Morse and Gray's actions on September 14, 2016 were nothing more than a permissible knock and talk.[6] The undisputed facts demonstrate that they did not conduct a "search" within the meaning of the Fourth Amendment. Plaintiff challenges the officers' conduct immediately after they were dispatched to respond to the burglary complaint at 4:43 am and the officers' conduct later that morning between approximately 5:00-5:30 am when Officer Morse returned to 13 Park Street. Complaint ¶¶ 157-58.

### i.   The Officers' Immediate Response

#### a.  Officers Morse and Gray's Initial Knock and Talk

As noted above, shortly after returning to the police station after the initial burglary complaint, Officers Morse and Gray received another call at approximately 4:43 am reporting that Plaintiff was seen at Ms. Nardone's residence. SMF ¶147. On their way to Ms. Nardone's, they learned that Plaintiff was seen running towards his residence so Officers Morse and Gray stopped at 13 Park Street to see if they could locate Plaintiff. SMF ¶¶ 149-50. They observed lights on in Plaintiff's building. SMF ¶ 151. Officers Morse and Gray walked onto the front porch of 13 Park Street, knocked on the front door, and announced themselves as police. SMF ¶¶ 152-53. After no one answered the door, Officers Morse and Gray walked off the porch and left the property. SMF ¶¶ 153-54.

There is no question that the front porch is a "classic example" of curtilage and enjoys the protection of the Fourth Amendment. *Jardines*, 569 U.S. at 7, 133 S. Ct. at 1414-15. Officers Morse and Gray's investigation by knocking on the front door while standing on the porch therefore occurred in a constitutionally protected area. However, the Supreme Court has recognized that it is

---

[6] Although it is undisputed that Det. Fearon knocked on the frame around Plaintiff's window, Plaintiff has not named Det. Fearon as a defendant in this action. Officers Morse and Gray cannot be held liable for Det. Fearon's conduct. Plaintiff has not alleged any so-called bystander liability, nor has he alleged a civil rights conspiracy. Therefore, while Det. Fearon's conduct is discussed, it is not meant to imply that Officers Morse and Gray are responsible for his conduct.

not a "search" within the meaning of the Fourth Amendment to enter the curtilage to approach the home in order to speak with the occupant, because the officers "do no more than any private citizen might do." *Kentucky v. King*, 563 U.S. 452, 469, 131 S.Ct. 1849, 1862 (2011). *See also Jardines*, 569 U.S. at 9, n.4, 133 S.Ct. at 1416 ("What *King* establishes is that it is not a Fourth Amendment search to approach the home in order to speak with the occupant, *because all are invited to do that*."). The question, therefore, is whether the officers accomplished their investigation through an "unlicensed physical intrusion." *Jardines*, 569 U.S. at 7, 133 S.Ct. at 1415.  They did not. Officers Morse and Gray were conducting a knock and talk, a permissible police investigative tool. Police officers have an implicit license, like all other citizens, to approach a home in order to speak with the occupants, even when the purpose of the knock and talk is to obtain evidence that may lead to the occupant's arrest. *Id.* at 9, n.4, 133 S.Ct. at 1416. ("The mere 'purpose of discovering information'' . . . in the course of engaging in that permitted conduct does not cause it to violate the Fourth Amendment.").

Officers Morse and Gray's actions in walking to the front door, knocking, and then leaving after there was no response was constitutionally permissible. Plaintiff apparently takes issue with the fact that the knock and talk was during the early hours of the morning. The knock and talk was conducted almost immediately after the second call, which came in at approximately 4:43 am, and reported that Plaintiff was seen running toward his residence. SF ¶ 40. Even so, there is no case law stating that the time of knocking alone is determinative of its reasonableness. Because Plaintiff had been seen moments before at Ms. Nardone's residence and the lights were on at 13 Park Street, Officers Morse and Gray had an objectively reasonable basis to believe that Plaintiff, or other people inside the residence, were awake. The fact that the officers knew that Plaintiff was a college student further supports the reasonableness of their actions. *Cf. Illinois v. Gates*, 462 U.S. 213, 230–32, 103 S. Ct. 2317, 2328–29, 76 L. Ed. 2d 527 (1983) (Discussing how law enforcement officers

are permitted to "formulate[] certain common-sense conclusions about human behavior.") (citation omitted). Based on the circumstances, it was reasonable for the officers to conclude that Plaintiff was awake and to attempt to make contact with him. The officers did not act unreasonably when they walked to the front door, knocked, and then left after there was no response. This is exactly the type of investigatory tactic that has been held not to constitute a search, but rather a permissible attempt at consensual contact.

### b.  Officer Gray's Second Knock and Talk

After the initial knock and talk, Officer Gray walked down the neighbor's driveway to the left of 13 Park Street and noticed a male subject peering out a basement window of 13 Park Street. SMF ¶ 156. He shined his flashlight into the window and the male subject covered the window. SMF ¶ 157. Officer Gray went back onto the front porch and knocked on the door again, but no one answered. SMF ¶ 158. Officer Gray left and drove his vehicle further up the road and parked it out of sight of 13 Park Street. SMF ¶ 159. Officer Gray walked back towards 13 Park Street and stood in the driveway of 15 Park Street to wait to see if Plaintiff came out of his building. SMF ¶ 160. Officer Gray's second attempt at a knock and talk after seeing someone in the building was also permissible. Officer Gray returned to the front door, knocked, and then left after no one answered. There is no prohibition on attempting a second knock and talk after learning additional information. Here, it was reasonable for Officer Gray to try knocking again after he had just seen someone in the building. The mere fact that this was his second attempt at knocking does not make it an unlicensed physical intrusion. Officer Gray's actions in walking down the neighboring driveway and shining his flashlight into the window "did not transform [his] observations into an unreasonable search within the meaning of the Fourth Amendment." *See United States v. Dunn*, 480 U.S. 294, 304–05, 107 S. Ct. 1134, 1141, 94 L. Ed. 2d 326 (1987).

### ii.    The Officers' Actions After Officer Morse Returns to 13 Park Street

### a.    Officer Morse's Knock and Talk at Plaintiff's Window

Officer Morse left 13 Park Street and went to 60 Park Street to talk to Ms. Nardone about the report that Plaintiff was just seen at her residence. SMF ¶ 161. Officer Morse learned that Plaintiff had entered the mud room of 60 Park Street and when the woman screamed, Plaintiff ran off in the direction of his house. SMF ¶¶ 161-62. Det. Fearon and Officer Orr arrived at 60 Park Street to assist with the call. SMF ¶ 163. Officer Morse went to stage (*i.e.* wait) near Park Street to see if Plaintiff left his residence while Det. Fearon and Officer Orr agreed to canvass the general area in an attempt to locate him. SMF ¶¶ 164-66. Officer Morse left 60 Park Street and drove to Fernald Street and parked next to Thai Kitchen, where he could still observe 13 Park Street. SMF ¶ 167. He observed the general area from that location, but did not see any activity. SMF ¶ 168.

Officer Morse subsequently met up with Officer Gray and the Old Town officers in the general area of 15-17 Park Street. SMF ¶ 173. Based on his prior interaction with Plaintiff, Officer Morse was familiar with the 13 Park Street building and he knew that it was not a single family house and that there were several tenants occupying the building. SMF ¶ 174. He also knew that Plaintiff's bedroom was located on the first floor of the building on the left side, bordering the neighbor's driveway. SMF ¶ 175. After speaking with the other officers and showing them where Plaintiff's bedroom was located, Officer Morse told them that he was going to go apply for a search warrant. SMF ¶¶ 175, 178-81. Det. Fearon suggested that they try knocking first. SMF ¶ 182.

Det. Fearon started knocking on the frame surrounding Plaintiff's bedroom window, announced himself as police, and asked Chris to come to the front door so they could talk to him. SMF ¶¶ 184-85. Officer Morse then knocked on the frame around Plaintiff's window, announced himself as the Orono PD, and said "come to the door." SMF ¶ 186. Officer Morse knocked again and said "let's go Chris," but no one responded. SMF ¶ 187. Det. Fearon knocked again and asked

Plaintiff to come to the door so they could talk to him. SMF ¶ 188. After receiving no response, Officer Morse walked towards the front of 13 Park Street and stopped in front of the building and stood closer to the sidewalk. SMF ¶ 189-90.

Officer Morse's actions in knocking on Plaintiff's bedroom window was permissible under the circumstances. The reasonableness of an expectation of privacy differs according to the context. *Cf. United States v. Werra*, 638 F.3d 326, 332 (1st Cir. 2011) (discussing the privacy interests in a traditional home compared with a residence more akin to a multi-unit apartment). Plaintiff's bedroom was located on the left side of his building and bordered the driveway of the neighboring building at 15 Park Street. SMF ¶¶ 175, 180. Officer Morse knew that there were multiple tenants in the building and was trying to talk to Plaintiff. SMF ¶ 174. He had attempted knocking on the front door earlier, but no one had responded. He also knew where Plaintiff's bedroom was located because he had been inside 13 Park Street on a prior occasion. SMF ¶ 175. Officer Morse also had information that the Plaintiff had just been seen in Ms. Nardone's residence and was reported to have run back toward 13 Park Street. SMF ¶ 149. Officer Morse's knock and talk did not violate the Fourth Amendment prohibition on unreasonable searches. The bedroom window was exposed to the public from the neighboring driveway. *Cf. United States v. Brown*, 510 F.3d 57, 65 (1st Cir. 2007) (concluding that if the driveway is exposed to public view, it does not fall within the curtilage). There was no fence or other structure blocking access to the bedroom window. Since the building was more akin to an apartment, it was reasonable for Officer Morse to knock where he knew Plaintiff was residing. Officer Morse did not use force to enter the area near Plaintiff's bedroom and, as the video clearly demonstrates, he did not conduct a search in those areas – he was only present in that area to knock to try to get Plaintiff's attention.

### b. Officer Gray's Knock and Talk

After no one responded at the window, Officer Gray attempted another knock and talk at the front door. As discussed above, this is a permissible police investigative tool. The undisputed record, including the video recording, shows that Officer Gray walked to the front porch and knocked on the front door. SMF ¶ 189. After approximately 30 seconds, Plaintiff's roommate answered the door. SMF ¶ 191; SF ¶ 46. The First Circuit and multiple appellate courts have found this approach to be a reasonable investigative tool. *See United States v. Smith*, 919 F.3d 1, 14 (1st Cir. 2019). The mere fact that he had attempted knocking on the front door earlier that morning does not automatically make this attempt by Officer Gray unconstitutional. Officer Gray's act of walking onto the front porch and knocking on the door in order to speak with Planintiff did not exceed the implicit license that has been recognized by the Supreme Court.

### C. Officers Morse and Gray are Entitled to Qualified immunity on Plaintiff's Fourth Amendment Claims

Even if the Court finds that there is a dispute of fact as to whether Officers Morse and Gray's conduct exceeded the scope of a permissible knock and talk, they are nevertheless entitled to qualified immunity. As discussed *supra* Section I(c), police officers are entitled to qualified immunity unless their conduct constitutes a violation that was "clearly established" at the time of the officer's conduct. *Saucier v. Katz*, 533 U.S. 194, 201–06, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001). For a right to be clearly established, the contours of the right must be "sufficiently definite that any reasonable official in the defendant's shoes would have understood that [s]he was violating it." *Plumhoff v. Rickard*, 134 S.Ct. 2012, 2023 (2014)) ("This exacting standard 'gives government officials breathing room to make reasonable but mistaken judgments' by 'protect [ing] all but the plainly incompetent or those who knowingly violate the law.'" *Sheehan*, 135 S. Ct. 1765, 1774 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743, 131 S. Ct. 2074, 2085, 179 L. Ed. 2d 1149 (2011)).

Even assuming that their conduct amounted to an unreasonable search under the Fourth Amendment, the law was not clearly established as of September 14, 2016. The burden of demonstrating that the law was clearly established at the time of the alleged constitutional violation is on the plaintiff. *McGrath v. Tavares*, 757 F.3d 20, 29 (1st Cir. 2014). Under the clearly established analysis, while it is not necessary for the plaintiff to find an identical case, "existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix v. Luna*, 136 S. Ct. 305, 308, 193 L.Ed.2d 255 (2015). The Supreme Court has "repeatedly stressed that courts must not 'define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced.'" *Wesby*, 138 S.Ct. 577, 590, 199 L. Ed. 2d 453 (2018) (quoting *Plumhoff*, 134 S.Ct. at 2023); *see also Pauly*, 137 S. Ct. at 551. Existing precedent as of September 14, 2016 demonstrates that reasonable officers in Officers Morse and Gray's situation would not have known that their conduct constituted an impermissible search under the Fourth Amendment. While the a general description of a knock and talk has been discussed by the Supreme Court, the scope and contours of what constitutes a permissible knock and talk was not clearly established.

In *Florida v. Jardines*, the Supreme Court held that officers were not permitted to introduce a trained K-9 to explore the area around the home in hopes of discovering incriminating evidence. In *Jardines*, the Court provided other examples of constitutionally impermissible conduct that went beyond a knock and talk, including a person exploring the front path with a metal detector or marching a bloodhound into the garden. *Fla. v. Jardines*, 569 U.S. 1, 8–9, 133 S. Ct. 1409, 1416, 185 L. Ed. 2d 495 (2013). The conduct at issue in *Jardines* and the examples provided by the Court involve far more than knocking and trying to get the attention of the occupants; it involves the introduction of other tools that are designed to enhance a search and discover evidence that would otherwise not be detected by the officers. Besides the general discussion of a knock and talk,

*Jardines* provides no guidance to officers regarding the scope of a permissible knock and talk besides that the introduction of search-enhancing tools onto constitutionally protected areas is impermissible.

In *Carroll v. Carman*, 574 U.S. 13, 135 S. Ct. 348 (2014), the Supreme Court reversed the Third Circuit panel's ruling that an officer was not entitled to qualified immunity from a homeowner's § 1983 claim asserting that the officer's "knock and announce" violated the Fourth Amendment because the officer approached a sliding glass door at the side of the home, rather than the front door. The Third Circuit had ruled that the officer violated the Fourth Amendment as a matter of law because the knock and talk exception requires police officers to begin their encounter at the front door where they have an implied invitation to go. *Id.*, at 350. In reversing, the Supreme Court explained that whether or not the rule applied by the Third Circuit was correct, it was not "beyond debate" and therefore the officers were entitled to qualified immunity. *Id.* at 352 (citations omitted). As of November 2014, the Supreme Court declined to decide whether a police officer may conduct a knock and talk at any entrance rather than only the front door. *Id.* Based on undersigned counsel's research, there has not been a more recent Supreme Court case clarifying the scope of a permissible knock and talk.

Based on *Jardines* and *Carroll*, Officers Morse and Gray must be granted qualified immunity. There is no Supreme Court case or controlling circuit precedent clearly establishing a right such that *every* reasonable official in Officers Morse and Gray's position would have understood that what they were doing violated that right. Their immediate response at 13 Park Street was in line with case law describing a knock and talk at the front door. Their conduct after Officer Morse returned to 13 Park included a minor departure from the front door by knocking near Plaintiff's bedroom window when they had reason to believe that the building was more akin to an apartment. The Supreme Court has declined to further clarify the permissible scope of a knock and

talk. And as recognized in *Carroll*, it was not clearly established that officers can only knock on the front door. Nor is there clear precedent prohibiting officers from only attempting a knock and talk once per investigation. There is no case law that would have clearly put Officer Morse on notice that knocking on a side window in a situation like the one he confronted would exceed his implicit license. There is also no case law that would have clearly put Officer Gray on notice that knocking on the front door more than once would offend the Fourth Amendment.

The Supreme Court has repeatedly admonished lower courts for ignoring the particularized facts of the case before them. *See, e.g. White v. Pauly*, 137 S.Ct. 548, 552 (2017). Here, Officer Morse's decision to try to make contact with Plaintiff by way of his bedroom window was not unreasonable given that Officer Morse knew Plaintiff occupied that bedroom and that Plaintiff had been seen moments before at Ms. Nardone's residence. Although it may be the obvious first choice, courts have not strictly limited a permissible knock and talk to the front door. *See, e.g. United States v. Daoust*, 916 F.2d 757, 758 (1st Cir.1990) ("[I]f [the front] door is inaccessible there is nothing unlawful or unreasonable about going to the back of the house to look for another door, all as part of a legitimate attempt to interview a person."). There is no clearly established law on point. The Supreme Court has never addressed whether a police officer may knock near a bedroom window that is exposed to a neighboring driveway, when multiple tenants live in the building and the officer has reason to believe the person he is looking for occupies that bedroom.  The contours of the knock and talk doctrine laid out in *Jardines* and *Carroll* would not have given a clear warning to the officers here that their conduct was prohibited under the Fourth Amendment.

The line between a knock and talk and a search is not clearly delineated. There is a formidable gray area that officers on the scene must confront at that moment in the midst of their duties and investigations. It cannot be said that *no* reasonable officer confronted with the same circumstances as Officers Morse and Gray would not have made the same choices. *See Malley v.*

*Briggs*, 475 U.S. 335, 343 (1986)) (recognizing that qualified immunity leaves "ample room for mistaken judgments."). As a result, they are entitled to qualified immunity on Plaintiff's Fourth Amendment claims based on an unlawful search.

### D.  Plaintiff Lacks Standing to Challenge the Officers' Conduct as to His Roommate

In asserting that his Fourth Amendment rights were violated, Plaintiff relies in part on the fact that his roommate, Corey, answered the door and alleges that the officers forced Corey to get Plaintiff. However, the issue is whether Defendants violated Plaintiff's Fourth Amendment rights, not Corey's. *Alderman v. United States*, 394 U.S. 165, 174, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969) ("Fourth Amendment rights are personal rights which ... may not be vicariously asserted."); *cf. Plumhoff v. Rickard*, 572 U.S. 765, 777–78, 134 S. Ct. 2012, 2022, 188 L. Ed. 2d 1056 (2014). While Plaintiff has standing to assert a Fourth Amendment claim, he cannot rely on the presence and actions of Corey to somehow enhance Plaintiff's Fourth Amendment rights because Defendants allegedly coerced Corey to answer the door and get Plaintiff.

In any event, the record does not support the assertion that Officers Morse and Gray coerced Corey to answer the door or coerced him to go get Plaintiff. As seen in the video recording, Corey answered the door about 30 seconds after Officer Gray started knocking. SMF ¶ 191. When Officer Gray asked if Plaintiff was home, Corey responded, "maybe." SMF ¶ 192. Corey voluntarily went to go get his roommate.  SMF ¶ 193. Officers Gray and Morse did not threaten, pressure or intimidate Corey in any way. Their brief exchange, which is captured on video, demonstrates that Corey was the one who asked if Officer Gray wanted him to go get Chris and when Officer Gray replied in the affirmative, Corey went back inside. SMF ¶¶ 192-93. The tactics here – knocking at the door, asking if his roommate was home, and agreeing to have Corey go look for Plaintiff – do not come close to being "inherently coercive" such that Corey's "capacity of self-determination was

critically impaired." *United States v. Bey*, 825 F.3d 75, 80–81 (1st Cir. 2016)(citations omitted); *cf. United States v. Jones*, 523 F.3d 31, 38 (1st Cir. 2008) (finding consent not coerced after "some ten to fifteen government agents, guns drawn, entered [the suspect's] hotel suite without knocking, handcuffed him, placed him in a separate room, and proceeded to interrogate him").

No reasonable jury could conclude that Corey's actions were anything but consensual. *See INS v. Delgado*, 466 U.S. 210, 216, 104 S.Ct. 1758 (1984) ("While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response"). Based on the undisputed record, Plaintiff's Fourth Amendment claim based on Officers Morse and Gray's interactions with Corey cannot survive summary judgment.

## E.   Officers Morse and Gray are Entitled to Summary Judgment on Plaintiff's Fifth Amendment Claim

In Count X, Plaintiff brings a claim pursuant to 42 U.S.C. § 1983 for a violation of his Fifth Amendment rights. Complaint ¶¶ 90, 163-168. Plaintiff alleges that he was in custody from the point when he exited his residence and therefore Officers Morse and Gray were required to provide him with *Miranda* warnings. Complaint ¶¶ 89-90. Plaintiff claims that Officers Morse and Gray's failure to provide *Miranda* warnings violated his rights guaranteed under the Fifth Amendment to the United States Constitution.

### i.       Plaintiff was Never Compelled to be a Witness Against Himself

The Fifth Amendment to the U.S. Constitution, made applicable to the States by the Fourteenth Amendment, requires that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Plaintiff cannot establish a violation of his Fifth Amendment right because he was never compelled to be a witness against himself in a criminal case. The failure to give *Miranda* warnings is not by itself a violation of the Fifth Amendment. *See*

*Chavez v. Martinez*, 538 U.S. 760, 766–70, 123 S.Ct. 1994, 155 L.Ed.2d 984 (2003). The charges against Plaintiff arising out of his arrest on September 14, 2016 were dismissed before trial, SMF ¶¶ 237-38, and therefore his § 1983 claim fails as a matter of law.[7]

The Supreme Court has rejected the notion that the term "criminal case" includes police interrogations. *Id.* at 766–67, 123 S.Ct. at 2000–01. Rather, a criminal case requires the initiation of legal proceedings. *Id.* The Supreme Court has further clarified that a violation of the Self-Incrimination Clause guaranteed by the Fifth Amendment does not occur until the use of compelled testimony at trial. *Id.* (citing *United States v. Verdugo–Urquidez*, 494 U.S. 259, 264, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990)) ("The privilege against self-incrimination guaranteed by the Fifth Amendment is a fundamental trial right of criminal defendants. Although conduct by law enforcement officials prior to trial may ultimately impair that right, a constitutional violation occurs only at trial"); *see also United States v. Patane*, 542 U.S. 630, 641–42, 124 S. Ct. 2620, 2628–29, 159 L. Ed. 2d 667 (2004) ("Potential [constitutional] violations occur, if at all, only upon the admission of unwarned statements into evidence at trial.").

In *Chavez*, the Court explained that the *Miranda* warning requirement and exclusionary rule is designed to safeguard a constitutional right. However, "Chavez's failure to read *Miranda* warnings to Martinez did not violate Martinez's constitutional rights and cannot be grounds for a § 1983 action." 538 U.S. at 772–73, 123 S. Ct. at 2003–04. *See also Patane*, 542 U.S. at 641–42, 124 S. Ct. at 2628–29 ("Our cases also make clear . . . that a mere failure to give *Miranda* warnings does not, by itself, violate a suspect's constitutional rights or even the *Miranda* rule."); *McConkie v.*

---

[7] Although Plaintiff alleges that Officers Morse and Gray obtained statements from Plaintiff on which they relied to arrest and charge him, Complaint ¶ 164, the record does not support that allegation. In fact, Plaintiff repeatedly denied breaking into Ms. Nardone's residence and taking her phone. SMF ¶ 230. Officers Morse and Gray did not believe his story and, in fact, disregarded his statements. SMF ¶ 231. Instead, they relied on Ms. Nardone's statements as well as Plaintiff's possession of the phone to arrest Plaintiff. *Id.* Because the Officers did not use any statements made by Plaintiff to arrest him, to the extent that allegation implicates a constitutional right, it is unsupported by the record.

*Nichols*, 446 F.3d 258, 261 (1st Cir. 2006) ("Even where an officer questions a suspect in an unlawful manner, this does not necessarily mean that the questioning entitles the plaintiff to damages under section 1983; the Supreme Court has recognized that it would be inappropriate to impose tort liability every time an officer obtains an involuntary self-incriminating statement or the police fail to honor *Miranda v. Arizona*.").

Here, it is undisputed that Plaintiff was never compelled to testify, nor were any of Plaintiff's statements used against him in a criminal case because the criminal charges were dismissed before there was a trial. SMF ¶¶ 237-38. The failure of Officers Morse and Gray to provide *Miranda* warnings, without more, is insufficient to establish a constitutional violation pursuant to § 1983. In light of *Chavez*, Plaintiff's Fifth Amendment claim against Officers Morse and Gray fails as a matter of law.

### ii.  Officers Morse and Gray Did Not Subject Plaintiff to a Custodial Interrogation

Even if Plaintiff could make out an actionable § 1983 claim based on a failure to provide *Miranda* warnings, Plaintiff's claim fails because, as the undisputed facts demonstrate, Plaintiff was not subject to a custodial interrogation by Officers Morse and Gray. In *Miranda v. Arizona*, 384 U.S. 436, 444 (1966), the Supreme Court stated, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda* announced police officers must warn a suspect that he has a right to remain silent, and a right to the presence of an attorney. The requirement of *Miranda* warnings only applies if a person is subject to custodial interrogation. *Stansbury v. California*, 511 U.S. 318, 322, 114 S. Ct. 1526, 1528, 128 L. Ed. 2d 293 (1994). Here, Plaintiff was not subject to a custodial interrogation and *Miranda* warnings were not required.

To determine whether a person is in custody for purposes of *Miranda*, courts generally inquire whether there has been a formal arrest or a "restraint of freedom of movement of the degree associated with a formal arrest." *Maryland v. Shatzer*, 559 U.S. 98, 112, 130 S. Ct. 1213, 1224, 175 L. Ed. 2d 1045 (2010) (quotations and citations omitted). However, "the freedom-of-movement test identifies only a necessary and not a sufficient condition for *Miranda* custody." *Id.* In other words, "custody under *Miranda* means a suspect is not free to go away, but a suspect's lack of freedom to go away does not necessarily mean that questioning is custodial interrogation for purposes of *Miranda*." *United States v. Ellison*, 632 F.3d 727, 729 (1st Cir. 2010).

The determination of custody for purposes of *Miranda* must take into account the totality of the circumstances and ask whether "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave," *Thompson v. Keohane*, 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995). This is an objective inquiry. *J.D.B. v. North Carolina*, 564 U.S. 261, 270, 131 S. Ct. 2394, 2402, 180 L. Ed. 2d 310 (2011). It does not depend on the subjective view of the questioning officers or the suspect being questioned. *Stansbury*, 511 U.S. at 323. The First Circuit has identified, without limitation, four factors to consider in determining whether there is a restraint on freedom of movement of the degree associated with a formal arrest: (1) "whether the suspect was questioned in familiar or at least neutral surroundings"; (2) "the number of law enforcement officers present at the scene"; (3) "the degree of physical restraint placed upon the suspect"; and (4) "the duration and character of the interrogation." *United States v. Hughes*, 640 F.3d 428, 435 (1st Cir. 2011).

Here, considering the circumstances surrounding the interaction between Plaintiff and Officers Morse and Gray on September 14, 2016, Plaintiff was not in custody for purposes of *Miranda*. First, Plaintiff was undoubtedly questioned in a familiar setting – just outside his own residence. The record, including the video evidence, demonstrates that all of the questioning of

Plaintiff was conducted on his front porch or just beyond his front porch. *See* SMF ¶ 195, 221. A suspect's own home "generally presents a less intimidating atmosphere than, say, a police station." *Hughes*, 640 F.3d at 435–36.

Second, the number of law enforcement officers present supports a finding that the questioning was non-custodial. *United States v. Campbell*, 741 F.3d 251, 267 (1st Cir. 2013) (finding "no indication that [the] police-to-suspects ratio was overwhelming" where each suspect was questioned by at most two officers."); *United States v. Crooker*, 688 F.3d 1, 4-5 (1st Cir. 2012) (suspect not in custody when there were four to eight agents present and two agents conversed with suspect); *United States v. Nishnianidze*, 342 F.3d 6, 13–14 (1st Cir.2003) (finding interrogation non-custodial when suspect was questioned by three officers). As seen in the video, there were three officers present during the questioning, but Officers Morse and Gray were the primary officers participating. *See* SMF ¶¶ 190, 194, 197. Det. Fearon was only minimally involved in asking a few questions. *See* SMF ¶ 205. Officers Morse and Gray were within feet of Plaintiff, but they did not invade his personal space. During the questioning, Det. Fearon remained a few feet away from the porch. SMF ¶ 205, 234. While a fourth officer, Officer Orr of the Old Town Police Department, came back to the scene later, she was not present for the interview and did not participate in the questioning at all. SMF ¶¶ 235-36.

The third factor, the degree of physical restraint placed upon Plaintiff, also supports a finding that he was not in custody for purposes of *Miranda*. Prior to being taken into custody, Plaintiff was not physically restrained by handcuffs or in any other way. *See* SMF ¶¶ 195, 215. Plaintiff was told that he could not re-enter his house by himself to search for the phone, as a matter of officer safety, but he was never told that he could not just leave or otherwise subjected to any physical force. SMF ¶¶ 214-15. At one point while they were waiting for his roommate to return,

Plaintiff freely sits down in a chair on the porch. SMF ¶ 221. No officer made any physical contact with Plaintiff until he was placed under arrest.

Finally, the duration and character of the interview was relatively short. It was approximately fifteen minutes from the time Plaintiff exited his residence to the time of his arrest, although he was not being questioned during that entire time period. SMF ¶ 232. Once the officers had Ms. Nardone's cell phone, Officers Morse and Gray questioned Plaintiff for approximately five minutes before taking him into custody. SMF ¶ 233. This relatively brief encounter, not more than fifteen minutes total, did not implicate *Miranda*. *See, Beckwith v. United States*, 425 U.S. 341, 342–43, 347–48, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976) (finding that three-hour interview in suspect's home did not implicate *Miranda*); *Hughes*, 640 F.3d at 437 (concluding that a ninety minute interview was "relatively short" in duration and did not implicate *Miranda*); *United States v. Nishnianidze*, 342 F.3d 6, 14 (1st Cir. 2003) (finding a forty-five minute interview not exceptionally long). All four factors support the finding that there was not a restraint on Plaintiff's freedom of movement of the degree associated with a formal arrest. Therefore, Plaintiff was not in custody for purposes of *Miranda*.

Even assuming that a reasonable person in Plaintiff's position would not have felt free to end the interview and walk away, there is a further inquiry of "whether the suspect would reasonably find the circumstances coercive." *Ellison*, 632 F.3d at 729. While the officers told Plaintiff to stop lying and be honest, the officers never yelled at Plaintiff and never threatened him. SMF ¶¶ 203-04. They asked Plaintiff open-ended questions about what had happened and then followed up with clarifying questions. Plaintiff was also fully dressed in pants and a t-shirt, SMF ¶ 239. *See Hughes*, 640 F.3d at 437 (considering factors such as whether suspect was appropriately dressed and whether officers were polite in analyzing custody). At one point, the officers started asking Plaintiff about his puppy, SMF ¶ 222, 225, which detracts from the suggestion that the

41

officers were menacing or that Plaintiff was coerced into providing information. Officers Morse and Gray's questioning of Plaintiff was not a custodial interrogation necessitating *Miranda* warnings. As such, their failure to provide *Miranda* warnings cannot support a Fifth Amendment claim.

### F.  Plaintiff's Right to Counsel under the Sixth Amendment was Not Triggered

In Count X, Plaintiff asserts a claim pursuant to 42 U.S.C. § 1983 for a violation of his Sixth Amendment right to counsel under the U.S. Constitution. This claim is also based on Officers Morse and Drost's failure to provide Miranda warnings to Plaintiff on September 14, 2016. Complaint ¶¶ 90, 164. The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. The right to assistance of counsel is "limited by its terms" and "does not attach until a prosecution is commenced." *Rothgery v. Gillespie Cty., Tex.*, 554 U.S. 191, 198, 128 S. Ct. 2578, 2583, 171 L. Ed. 2d 366 (2008) (internal quotation omitted); *see also Montejo v. Louisiana*, 556 U.S. 778, 786, 129 S. Ct. 2079, 2085, 173 L. Ed. 2d 955 (2009) ("Under our precedents, once the adversary judicial process has been initiated, the Sixth Amendment guarantees a defendant the right to have counsel present at all "critical" stages of the criminal proceedings."). The Supreme Court has held that the right to the assistance of counsel "guaranteed by the Sixth Amendment applies at the first appearance before a judicial officer at which a defendant is told of the formal accusation against him and restrictions are imposed on his liberty." *Rothgery*, 554 U.S. at 194, 128 S. Ct. at 2581; *see also United States v. Boskic*, 545 F.3d 69, 81 (1st Cir. 2008) ("The Supreme Court has often explained that a criminal prosecution commences, and the right to counsel attaches, at or after 'the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'") (quoting *Rothgery*).

Here, Plaintiff's Sixth Amendment right to counsel did not attach when Officers Morse and Gray interacted with him on September 14, 2016 because an adversary judicial process had not been

initiated. During their questioning, the officers were still investigating the crime; they had not, and could not have initiated a prosecution. In the early morning hours of September 14, there had been no formal charge, indictment, information, arraignment or any other event manifesting a "commitment to prosecute" that would have triggered the Sixth Amendment. *See Rothgery*, 128 S.Ct. at 2591. *See also Boskic*, 545 F.3d at 84 ("The Sixth Amendment takes hold when the investigation gives way to a prosecution, broadly guaranteeing the defendant the assistance of counsel as he negotiates the intricate procedures of the adversary criminal system.").

> The First Circuit has recognized the distinction between the Fifth and Sixth Amendments:
>
> Access to counsel may be helpful before the Sixth Amendment right attaches, particularly when suspects confront the custodial interrogations that are the hallmark of the investigative process. However, the Sixth Amendment is not directed at the risks of self-incrimination inherent in such confrontations; in those settings, suspects must instead rely on the Fifth Amendment . . .

*Boskic*, 545 F.3d at 83–84. Even assuming that Plaintiff was subjected to a custodial interrogation by Officers Morse and Drost, that is insufficient to trigger his right to counsel under the Sixth Amendment. Plaintiff's Sixth Amendment claims against Officers Morse and Drost necessarily fail because all of the conduct complained of occurred prior to an event sufficient to trigger his Sixth Amendment right to counsel. Because Plaintiff's right to counsel under the Sixth Amendment never attached during his interaction with Officers Morse and Gray, he cannot demonstrate a violation of his Sixth Amendment rights as a matter of law.

### G. Officers Morse and Gray are Entitled to Qualified Immunity on Plaintiff's Fifth and Sixth Amendment Claims

Even assuming that Plaintiff's allegations could implicate § 1983 liability, which as discussed above, they cannot, Officers Morse and Gray are entitled to qualified immunity. While it was clearly established that *Miranda* warnings are required prior to a custodial interrogation, the determination of the exact moment when a person is subjected to a custodial interrogation was not.

*See Berkemer v. McCarty*, 468 U.S. 420, 441, 104 S.Ct. 3138 (1984) (recognizing the "occasiona[l] ... difficulty" that police and courts nonetheless have in "deciding exactly when a suspect has been taken into custody"). The Supreme Court has recognized that "[p]olice must make in-the-moment judgments as to when to administer *Miranda* warnings." *J.D.B. v. North Carolina*, 564 U.S. 261, 271, 131 S. Ct. 2394, 2402, 180 L. Ed. 2d 310 (2011). A mistake as to that determination, which involves an analysis of the attendant facts and law, should not subject an officer to civil liability. Even if Officers Morse and Gray erred in concluding that Plaintiff was not in custody for purposes of *Miranda*, they are nevertheless entitled to qualified immunity.

Qualified immunity shields from liability "all but the plainly incompetent [and] those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092 (1986).  Qualified immunity is generally invoked in cases "where legal principles were unclear at the time of the disputed conduct, it also protects reasonable assessments of fact . . . even if matters might have been handled differently in the calm of retrospective appraisal."  *Statchen v. Palmer*, 623 F.3d 15, 18 (1st Cir. 2010) (citations omitted). The aim of the doctrine of qualified immunity "in both cases is to avoid the chilling effect of second-guessing where the officers, acting in the heat of events, made a defensible (albeit imperfect) judgment."  *Id.* Here, a reasonable officer under the circumstances reasonably would have concluded that they were entitled to ask Plaintiff questions for approximately 15 minutes, outside of his residence without first providing him *Miranda* warnings. Plaintiff was just seen in Ms. Nardone's residence, which was the scene of a burglary. According to Ms. Nardone, he also jumped on her car earlier in the evening. Based on the four factors as discussed above, it would not have been clear to every reasonable officer that Plaintiff was in custody for purposes of *Miranda* when they questioned Plaintiff prior to his arrest.  As a result, Officers Morse and Gray are entitled to qualified immunity.

### III.   PLAINTIFF'S SUPERVISORY AND MUNICIPAL LIABILITY CLAIMS FAIL AS A MATTER OF LAW

Plaintiff alleges supervisory and municipal liability claims against Defendant Ewing and the Town of Orono based on a failure to train and supervise. Complaint at Counts VII, VIII, XII, XIII. Plaintiff also alleges that the alleged unconstitutional actions leading to Plaintiff's arrests in February and September 2016 were caused by an unconstitutional policy or custom of the Town. *Id.* Plaintiff's supervisory and municipal liability claims fail as a matter of law because there was no underlying constitutional violation. In the alternative, Plaintiff cannot meet the deliberate indifference standard as a matter of law.

#### A.   There was No Underlying Constitutional Violation

In order to establish supervisory or municipal liability against Defendant Ewing or the Town of Orono, Plaintiff would need to show that one of the Orono officers violated Plaintiff's constitutional rights. *See Estate of Bennett v. Wainwright*, 548 F.3d 155, 177-78 (1st Cir. 2008) ("The establishment of § 1983 liability against either [the Town] or the County would ultimately depend on plaintiff proving the commission of an underlying constitutional violation by the subordinate officers."); *Wilson v. Town of Mendon*, 294 F.3d 1, 6 (1st Cir. 2002) ("If, however, the officer has inflicted no constitutional harm, neither the municipality nor the supervisor can be held liable."). For the reasons set forth above, there was no underlying constitutional violation by an Orono officer with respect to the February or September incident.  Accordingly, Plaintiffs supervisory and municipality claims fail as a matter of law.

#### B.   Plaintiff Cannot Meet the Deliberate Indifference Standard

Even if there was a question of fact as to whether there was an underlying constitutional violation by the Orono police officers, Plaintiff cannot, as a matter of law, meet the standard for municipal or supervisory liability. Governmental entities can be held liable under Section 1983 for

constitutional violations committed pursuant to an unconstitutional custom, policy or practice, *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690, 98 S. Ct. 2018 (1978), but such liability exists "only where [the entity] *itself* causes the constitutional violation at issue. *Respondeat superior* or vicarious liability will not attach under § 1983." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989) (emphasis in original). "This requires that the plaintiff demonstrate both the existence of a policy or custom and a causal link between that policy and the constitutional harm." *Santiago v. Fenton*, 891 F.2d 373, 381 (1st Cir. 1989). The First Circuit has explained that:

> The Supreme Court, concerned that municipal liability based on fault by the City might collapse into de facto *respondeat superior*, has set a very high bar for assessing municipal liability under *Monell*. The alleged municipal action at issue must constitute a "policy or custom" attributable to the City. Further, the Supreme Court has imposed two additional requirements: 1) that the municipal policy or custom actually have caused the plaintiff's injury, and 2) that the municipality possessed the requisite level of fault, which is generally labeled in these sorts of cases as "deliberate indifference."

*Young v. City of Providence ex rel. Napolitano*, 404 F.3d 4, 26 (1st Cir.2005) (citations omitted).

A failure to train or supervise may only serve as a basis for liability where the conduct "'amounts to deliberate indifference to the rights of the persons with whom the police come into contact,' and is 'closely related' to, or 'the moving force' behind, the constitutional injury." *Norton v. City of S. Portland*, 831 F. Supp. 2d 340, 365 (D. Me. 2011) (citing *Hayden v. Grayson*, 134 F.3d 449, 456 (1st Cir. 1998)). To establish municipal liability based on a failure to train or supervise, it is not sufficient "to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct." *City of Canton*, 489 U.S. at 391. A plaintiff must also prove that the deficiency in training actually caused the police officers' indifference to constitutional rights. *Id.* at 391-92. To be successful, therefore, a claim that a municipality has violated the Constitution through its failure to train or supervise its employees requires a showing that the failure to provide training or supervision demonstrated "deliberate

indifference to the rights of persons with whom the untrained employees come into contact." *Thompson*, 563 U.S. at 61 (quotation omitted). With respect to Plaintiffs' failure to train claim, "the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform. That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the [municipality]." *City of Canton*, 489 U.S. at 390.

The undisputed evidence in the factual record accompanying this Motion refutes any claims that Plaintiffs can meet the stringent standard of "deliberate indifference" to "obvious" deficiencies in training to support a municipal liability claim. Here, Plaintiff alleges that Chief Ewing and the Town failed to train and supervise Orono officers in issuing cease harassment notices and in differentiating them from protection from harassment orders issued by the Court. Complaint ¶ 142.  However, the record evidence shows that the Orono Police Department field training program specifically provides training on the difference between a cease harassment notice and a protection from harassment order. SMF ¶ 248. All Orono police officers receive training and are instructed to utilize a standard form that specifically includes the applicable statutory language regarding harassment. SMF ¶ 249. Plaintiff also alleges that Chief Ewing and the Town of Orono failed to train officers regarding legal standards and processes for constitutionally permissible searches, interrogations, and requirements under *Miranda*. The record evidence, however, shows that all Orono police officers are initially trained at the Maine Criminal Justice Academy on these standards and topics and must complete all of the training mandated by the MCJA to maintain their certification with the State. SMF ¶¶ 242-45, 253. Orono officers also received additional training on these topics during an extensive field training program where officers are paired with a more experienced officer to obtain hands on training while being directly supervised. SMF ¶¶ 245-47.

In addition, the Orono Police Department has comprehensive policies that govern the conduct of its officers in order to ensure that they carry out their duties in accordance with the United States

Constitution and Maine law. SMF ¶¶ 261-63. All of the Orono policies are in compliance with the policies mandated by the Maine Criminal Justice Academy. SMF ¶ 258. All officers receive training on the Orono Police Department policies during field training and, as appropriate, as policies are updated. SMF ¶ 260.

There is also no evidence in the record that Chief Ewing or the Town of Orono acted with the requisite deliberate indifference. The Chief was not on notice that there were any deficiencies in his training program or that there was a policy, custom, or pattern of unconstitutional conduct on the part of Orono officers. Prior to receiving the complaints in this case, Chief Ewing was not aware of any widespread complaints regarding his officers' issuance of cease harassment notices, arrests for harassment without probable cause, conducting knock and talks, or the failure to provide *Miranda* warnings. SMF ¶¶ 270-73. The evidence demonstrates that the Orono training program is comprehensive and the Orono officers are adequately supervised. Based on the undisputed record, no reasonable jury could infer that Chief Ewing or the Town acted with deliberate indifference or that there was an unconstitutional custom, policy or practice or a deficiency in training that caused the deprivation of rights alleged here.

## IV.     THERE IS NO EVIDENCE THAT WOULD SUPPORT AN AWARD OF PUNITIVE DAMAGES

As a preliminary matter, punitive damages are a form of relief, not a separate cause of action. Nonetheless, the individual Defendants are entitled to summary judgment on Plaintiff's punitive damages claim (Counts VI and XI) because, as discussed above, there was no constitutional violation, or, in the alternative, Defendants are entitled to qualified immunity.  Even if the underlying constitutional claims survive summary judgment, Defendants are still entitled to summary judgment on Plaintiff's punitive damages claim.  Punitive damages in a §1983 civil rights action can be granted "only if 'the defendant's conduct is shown to be motivated by evil motive or

intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" *Concepcion Chaparro v. Ruiz-Hernandez*, 607 F.3d 261, 268 (1st Cir. 2010) (quoting *Smith v. Wade*, 461 U.S. 30, 56, 103 S.Ct. 1625 (1983)).  The Plaintiff has produced no evidence that Defendants acted "in the face of a perceived risk that [their] actions [would] violate federal law." *Cabral v. U.S. Dep't of Justice*, 587 F.3d 13, 24-25 (1st Cir. 2009) (citations omitted).  The undisputed facts, much of which is captured on video/audio recordings, demonstrates that the officers responded to specific complaints about Plaintiff's behavior.  The officers investigated the complaints, including asking Plaintiff to tell his side of the story. SMF ¶¶ 6, 20-21, 197, 227. There is no evidence of evil motive or intent on the part of Defendants Drost, Merrill, Gray, and Morse.  There is ample evidence that police were motivated only to protect the complainant.  Accordingly, Defendants are entitled to summary judgment on Counts VI and XI.

<u>**CONCLUSION**</u>

For the foregoing reasons, Defendants request that the Court enter summary judgment in their favor as to all of Plaintiff's claims against them.

Dated at Portland, Maine, this 30th day of August, 2019

*/s/ Kasia S. Park*
Edward R. Benjamin, Jr., Esq.
Kasia S. Park, Esq.
Drummond Woodsum & MacMahon
84 Marginal Way, Suite 600
Portland, ME
(207) 772-1941
ebenjamin@dwmlaw.com
kpark@dwmlaw.com
*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 30, 2019, I electronically filed the foregoing Defendants'

Motion for Summary Judgment with the Clerk of CM/ECF system, which will send notification of

such filings to all counsel of record.


/s/ Kasia S. Park
Kasia S. Park

*Attorney for Defendants*
84 Marginal Way, Suite 600
Portland, ME
(207) 772-1941
kpark@dwmlaw.com