UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

CHRISTOPHER FRENCH,           )
                             )
           Plaintiff          )
                             )
      v.                      )        1:18-cv-00073-JCN
                             )
DANIEL MERRILL, et al.,       )
                             )
           Defendants         )

**DECISION AND ORDER ON
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff asserts state law and constitutional claims based on his encounters with Orono police officers in 2016. The matter is before the Court on Defendants' motion for summary judgment. (Motion, ECF No. 36.)

Following a review of the summary judgment record, and after consideration of the parties' arguments, the Court grants Defendants' motion for summary judgment.

## FACTUAL BACKGROUND

On February 18, 2016, at approximately 1:14 a.m., Defendants Drost and Merrill, an officer and sergeant, respectively, with the Orono Police Department, and Officer Haass, went to 60 Park Street in Orono, after a citizen in a nearby house called 911 to report a verbal altercation. Upon arrival, the officers saw two males, one of whom was later identified as Plaintiff, standing on the sidewalk outside the residence. The other male was a resident of 60 Park Street. After speaking with those present, including two other occupants of 60 Park Street, one of whom was Samantha Nardone, the officers learned that Plaintiff and Ms. Nardone were in a dating relationship and that Plaintiff, who did not

reside at 60 Park Street, had refused to leave Ms. Nardone's residence. Plaintiff lived in an apartment a short distance from Ms. Nardone's residence. Plaintiff and Ms. Nardone were students at the University of Maine.

Ms. Nardone informed Defendants Drost and Merrill that when she told Plaintiff that she intended to call 911, Plaintiff took her cell phone and left the room. She also stated that she and Plaintiff recently had a similar altercation. Ms. Nardone did not want to pursue criminal charges. In her discussion with the officers, Ms. Nardone stated that based on Plaintiff's behavior that evening, her relationship with Plaintiff was over. She also reported that her altercations with Plaintiff had never involved physical violence. When asked if she wanted the officers to give Plaintiff a criminal trespass warning that would bar him from her premises, she declined and stated that they each had personal property of the other that they would need to exchange.

Defendant Drost advised Plaintiff that he could not return to Ms. Nardone's residence that evening, and that Ms. Nardone wanted to exchange personal property the next day. Drost cautioned Plaintiff that if an officer had to return, Plaintiff would receive a criminal trespass warning that would bar him from Ms. Nardone's residence for a year. Plaintiff understood the warning to require that he stay away for the next 24 hours, and he left the scene. Plaintiff asserts that he thought Defendant Drost had directed him to return Ms. Nardone's property within the day.

At 1:45 a.m., during his walk home, and before the officers had left the scene, Plaintiff sent Ms. Nardone some offensive text messages. Ms. Nardone informed the officers of the messages. Defendants Merrill and Drost explained to Ms. Nardone that they

could serve a cease harassment notice on Plaintiff, and that he could be arrested and charged with a crime if he continued to harass her after being served the notice. Ms. Nardone requested that they serve Plaintiff with the notice.

The officers drove to Plaintiff's residence and found him standing on the sidewalk. Defendant Drost completed a cease harassment notice and served it on Plaintiff. The notice read: "You are forbidden from engaging, without reasonable cause, in any course of conduct with the intent to harass, torment or threaten … Samantha Nardone." Drost returned to 60 Park Street, gave Ms. Nardone a copy of the notice, and advised her that if Plaintiff harassed her through texts or social media, she should take screen shots of the communications and call the Orono Police Department.[1]

On the evening of February 18, Ms. Nardone informed Defendant Drost that Plaintiff had called, texted, and direct messaged her that day; she characterized the communications as harassment.[2] Ms. Nardone also told Drost that her friends informed her that Plaintiff appeared at the old meeting room for one of her regularly scheduled meetings on campus.

Ms. Nardone subsequently met with Drost at the Orono police station and informed him that Plaintiff had been sending messages through instagram and snapchat. She provided a witness statement (ECF No. 35-5) that recounted her version of events related

---

[1] Merrill testified at his deposition that the cease harassment notice effectively told Plaintiff to stop contacting Ms. Nardone, and that continued contact could be construed as harassment. (Merrill Dep. at 194, ECF No. 35-14.) Plaintiff maintains that the notice did not bar all communication. Plaintiff also asserts that he anticipated an exchange of property, if Ms. Nardone agreed to meet with him for that purpose.

[2] Plaintiff asserts his communications were good faith attempts to arrange for an exchange of property.

to the early morning of February 18 and the communications that followed throughout the day.  In the statement, Ms. Nardone asserted that Plaintiff's communications included email, and that Plaintiff "stalked the old meeting room for 2 hours, … pacing everywhere checking all the rooms."  Ms. Nardone also reported that, when she and a friend went to a local store, Plaintiff drove into the parking spot next to Ms. Nardone's vehicle and rolled down his window to talk.  When Ms. Nardone drove away, Plaintiff did not follow.  According to Ms. Nardone, Plaintiff continued to attempt to contact her through email.  In her statement, Ms. Nardone wrote that Plaintiff's conduct "terrifie[d]" her, especially when she was alone.  Ms. Nardone told Defendants Drost and Merrill that she thought she should transfer from the University of Maine.

In two early morning messages to Ms. Nardone on February 18, Plaintiff wrote that he had "cheated" and that he was going to harm himself. (ECF No. 35-6.)  In evening messages, Plaintiff asked Ms. Nardone how she could be "so mean" and "heartless."  In other messages, Plaintiff attempted to arrange a meeting to return certain items.  At around 7:30 p.m., Plaintiff informed Ms. Nardone that because she did not respond to his messages regarding the exchange of property, he would drop off the items.  At 10:54 p.m., Plaintiff emailed Ms. Nardone to ask where she was.  At 11:38 p.m., he wrote that he would find her.  At 11:48 p.m., he asked whether she would meet with him.  Ms. Nardone did not respond to any of the messages.  Plaintiff also called Ms. Nardone several times, including one or more "blocked" calls that did not show his caller identification.[3]

---

[3] Plaintiff observes that the record offers "no indication [whether] Ms. Nardone actually read any individual message or whether she found any particular message as indicating an intent on Plaintiff's part to harass,

During the meeting at the police station, Ms. Nardone asked whether Plaintiff was in trouble for contacting her.  Defendant Drost replied that Plaintiff was in trouble.[4]  Based on the events of February 18, the officers decided to arrest Plaintiff for violation of the cease harassment notice.  Ms. Nardone agreed to assist them in the effort, but she expressed concern about what Plaintiff might do when released from custody.  The officers told Ms. Nardone that following his arrest, and given the circumstances, Plaintiff would be subject to a condition of bail that prohibited contact with her.  While at the station, Ms. Nardone answered a call from Plaintiff.  During the conversation, she agreed to meet with him and said she would contact him.  Ms. Nardone then invited Plaintiff to her residence.

Plaintiff drove to Ms. Nardone's residence in the early morning hours of February 19. Defendant Drost, who was waiting inside the residence, met Plaintiff at the door and arrested him.  Drost detected the smell of alcohol on Plaintiff, and on that basis, he brought Plaintiff to the police station to administer an intoxilyzer test.  Plaintiff refused to perform the test.  Defendant Drost then transported Plaintiff to the Penobscot County Jail, where he charged Plaintiff with harassment, operating under the influence (refusal), and driving

---

torment, or threaten her," or even "what Ms. Nardone thought of any particular message."  (*E.g.*, Pl.'s Responsive Statement ¶ 50, ECF No. 68).  Plaintiff also maintains that Ms. Nardone was under the misimpression that the cease harassment notice prohibited all communication.  Plaintiff acknowledges that Ms. Nardone did not respond to any of his several messages, but he observes that she did not tell him to stop messaging her.  Plaintiff also explains that he felt obligated to exchange property sometime that day because he believed the officers had advised him that an exchange should take place.  In Plaintiff's view, the officers should not have found Ms. Nardone's statement credible.

[4] At his deposition, Defendant Drost testified that in his view, even if Plaintiff had sent heart emojis for 25 minutes, Plaintiff would have engaged in harassment.  (Drost Dep. at 278, ECF No. 35-15.)

without a license; Drost also issued Plaintiff a summons for a civil violation for possession of a false identification.

At the jail, Defendant Drost spoke to the bail commissioner, explained why he arrested Plaintiff, and recommended that the bail commissioner not grant Plaintiff bail. The bail commissioner did not release Plaintiff on bail.  At approximately 4:00 p.m. that same day, a judge granted bail to Plaintiff.  By the time of his release, Plaintiff had been in custody for 18 hours.  On April 11, 2016, the State dismissed the charges against Plaintiff based on insufficiency of evidence.

Between the 2016 spring and fall academic semesters, Plaintiff and Ms. Nardone reunited.  On September 14, 2016, at approximately 3:19 a.m., Defendants Morse and Gray, officers of the Orono Police Department, responded to a complaint originating at 60 Park Street in Orono.  Morse, who was the first to arrive, spoke with Ms. Nardone and her roommate and obtained sworn statements from them.  Ms. Nardone told the officers that she and Plaintiff ended their relationship days earlier.  She stated that on the evening of September 13, 2016, she encountered Plaintiff at a local pub.  Later that evening, Plaintiff ran into the street toward Ms. Nardone's vehicle.  Plaintiff asked where she had been, and he accused her of driving drunk.  Ms. Nardone reported that Plaintiff jumped onto her vehicle.[5]  Ms. Nardone stated that she and her roommate then returned to their residence and locked themselves in for the night.  Ms. Nardone recalled having her phone in the residence and leaving it by her bed before she went to sleep, at approximately 12:30 a.m.

---

[5] Plaintiff denied the allegation at the time and continues to deny the allegation.

When she awoke at 3:00 a.m., her phone was missing.  When Ms. Nardone and her roommate looked for the phone, they were surprised to find all the doors in the residence unlocked.

Ms. Nardone informed Defendant Morse that she suspected Plaintiff had entered the residence and taken her phone, but she did not know how he entered.  She also said that Plaintiff had taken her keys the prior week and not returned them.  According to Ms. Nardone, Plaintiff had previously entered the residence and taken items, including her laptop.  Ms. Nardone told Morse and Gray that if Plaintiff accessed her cell phone, she would not feel safe.

Shortly after Defendants Morse and Gray returned to the police station, between 4:00 and 5:00 a.m., dispatch informed them that Plaintiff was just seen at Ms. Nardone's residence.  Morse and Gray then drove to 60 Park Street.  As they approached, dispatch advised that Plaintiff had been seen running down the road in the direction of his residence at 13 Park Street.  Defendants Morse and Gray initially stopped at 13 Park Street. They observed lights on in the building, walked onto the front porch, knocked on the front door, and announced they were police officers who wanted to speak with Plaintiff.  No one answered the door.  The officers then walked off the property.  Defendant Gray remained nearby to watch the building while Defendant Morse went to 60 Park Street.  Plaintiff was inside 13 Park Street and turned off the lights in the hope he might discourage any further police presence.

Viewed from the street, the home at 13 Park Street has a small, open front porch or landing with a door.  The home's driveway is on the right side.  The left side of the home

7

is close to the neighboring home's driveway.  On the left side of Plaintiff's home is a cellar window at ground level and a bedroom window that is low enough for a person of average height to knock on the window frame.  The home is separated from the neighboring property by a narrow strip of grass, perhaps four or five feet wide.  Based on prior experiences involving Plaintiff, the officers believed (correctly) that the window was Plaintiff's bedroom window. [6]

Defendant Gray walked down the neighboring home's driveway and noticed a male looking out the basement window of Plaintiff's residence.  Gray shined his flashlight at the window and the person inside covered the window. Gray then returned to the porch and knocked/banged on the door again, but no one answered.

Meanwhile, at 60 Park Street, Ms. Nardone told Defendant Morse that she and her roommate called the officers because Plaintiff had entered the first doorway of the women's residence into the mudroom, but he ran off when Ms. Nardone and her roommate screamed.  After speaking briefly with Ms. Nardone, Morse left and met Gray near 13 Park Street.  Morse entered the driveway of 13 Park Street and saw lights on in the kitchen.  He told Gray and Old Town Police Detective Fearon, who also arrived at the scene, that he would prepare a search warrant application.  Detective Fearon suggested that they first make another attempt to knock and talk.

---

[6] Plaintiff observes that the officers did not know for certain that the window was to Plaintiff's bedroom, but assumed it was Plaintiff's room based on a November 2015 visit related to Plaintiff.  (Pl.'s Statement of Facts ¶¶ 339, 339A.)   The term "strip of grass" reference is from Plaintiff's Second Amended Complaint. (Pl.'s Second Amended Opp'n at 21.)

Detective Fearon walked down the neighbor's driveway, stepped onto the narrow strip of grass outside Plaintiff's bedroom window, knocked on the window frame, shined his flashlight on the window, and said "Police Department." (Pl.'s Responsive Statement of Facts ¶ 184, ECF No. 68.) He knocked on the window frame a second time and stated, "Chris, why don't you come to the front door so we can speak with you." (*Id.*) He then knocked on the window frame a third time and stated, "Chris, Police Department, why don't you come to the front door so we can chat for a minute." (*Id.*) At this point, Defendant Morse joined Detective Fearon, knocked on the window frame and stated, "Orono P.D., Chris. Come to the door." (*Id.*) Morse knocked on the frame again and stated, "Let's go, Chris." (*Id.*) Finally, Detective Fearon once more knocked on the window and stated, "Come on Chris. Why don't you come to the door so we can talk." (*Id.*)

Defendant Gray then walked to the front door, walked onto the porch, and knocked on the front door. A young man—not Plaintiff—answered the door. After a brief exchange, the man agreed to look for Plaintiff. A few minutes later, Plaintiff stepped outside and closed the door behind him. Gray observed that Plaintiff was sweating. Plaintiff said he did not want any trouble. Morse asked Plaintiff what he was doing at Ms. Nardone's residence. Plaintiff stated he went to ask for help with his puppy and left when the women started yelling.

When Defendant Morse first asked Plaintiff about Ms. Nardone's cell phone, Plaintiff denied having it. During the ensuing discussion about the phone, Plaintiff perceived that Morse and Gray were annoyed with him. Detective Fearon stated the matter

would end if they could get the phone.  Plaintiff "agreed to see if [he] could get the phone" and said that he "would go in and get the phone." (Pl.'s Affidavit ¶¶ 124 – 125, ECF No. 54). When Plaintiff started to enter the residence, Detective Fearon stated that Plaintiff would not be permitted to reenter without an officer.  Gray said the officers would not let Plaintiff out of their sight.  Plaintiff immediately pulled his door closed and stated he did not want an officer to enter the residence.[7]  According to Plaintiff, at that moment he "realized they were not going to let him go back into his own house" and he "was stuck outside with them and they were not going away."  (Pl.'s Amended Statement of Facts ¶ 163, ECF No. 75.)

Detective Fearon suggested that Plaintiff could have a roommate get the phone, and Plaintiff agreed.  Plaintiff knocked at the door to summon a roommate and asked the roommate (the man who first answered the door) to look for the phone in Plaintiff's room. During this interaction, Detective Fearon noticed that Plaintiff had a cell phone in his pocket and asked Plaintiff about the phone.  Plaintiff said the phone was his own and he handed it to the officers upon Morse's request.

After a few minutes, the roommate returned and reported the search was not successful.  Plaintiff told him to look on the basement stairs.  While the roommate looked for the phone the second time, Plaintiff asked if he was going to be arrested.  Defendants

---

[7] Plaintiff explains that he did not believe that the officers were concerned for their safety, and he thought they were only looking for additional grounds on which to "get him in trouble."  (Pl.'s Amended Statement of Facts ¶ 161, ECF No. 75.)  *Id.*

Morse and Gray said they did not know.  Shortly thereafter, the roommate returned with Ms. Nardone's phone.

Defendants Morse and Gray asked Plaintiff to explain how he came into possession of the phone.  Plaintiff said that when he walked past Ms. Nardone's residence, he saw it on the ground, along with another item belonging to Ms. Nardone, and that he picked it up so he could give it to her later.  Plaintiff repeatedly denied entering the house.  Concluding that Plaintiff's account was not credible, based on the information provided by Ms. Nardone and her roommate, and the fact that Plaintiff had Ms. Nardone's cell phone, Morse and Gray arrested Plaintiff for burglary.[8]

In March 2017, the District Attorney dismissed the criminal charges against Plaintiff. According to the notice of dismissal, the matter was dismissed because "the victim refuses to cooperate and is out of state." (Notice of Dismissal, ECF No. 35-34.)

The defendant officers are graduates of the Maine Criminal Justice Academy and duly-certified law enforcement officers.  While they were employed by the Town of Orono, the Town provided the defendant officers with additional, relevant training.

## DISCUSSION

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "After the moving party has presented evidence in support of its motion for summary judgment, 'the burden shifts to the nonmoving party, with

---

[8] Plaintiff contends that had the officers further investigated the matter, they would have found evidence that substantiated his explanation of how he came into possession of the phone.

respect to each issue on which he has the burden of proof, to demonstrate that a trier of fact reasonably could find in his favor.'" *Woodward v. Emulex Corp*., 714 F.3d 632, 637 (1st Cir. 2013) (quoting *Hodgens v. Gen. Dynamics Corp*., 144 F.3d 151, 158 (1st Cir. 1998)).

A court reviews the factual record in the light most favorable to the non-moving party, resolving evidentiary conflicts and drawing reasonable inferences in the nonmovant's favor. *Perry v. Roy*, 782 F.3d 73, 77 (1st Cir. 2015). If a court's review of the record reveals evidence sufficient to support findings in favor of the non-moving party on one or more of the claims, a trial-worthy controversy exists, and summary judgment must be denied as to any supported claim. *Id.* ("The district court's role is limited to assessing whether there exists evidence such that a reasonable jury could return a verdict for the nonmoving party." (internal quotation marks omitted)). Unsupported claims are properly dismissed. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 – 24 (1986).

## A.    Plaintiff's Second Amended Complaint

In his second amended complaint, Plaintiff asserts thirteen counts or causes of action. Plaintiff asserts the counts containing constitutional claims pursuant to 42 U.S.C. §§ 1983 and 1988.[9] The first eight claims are based on the February 2016 incident. The remaining claims are based on the September 2016 incident. The counts are as follows:

---

[9] Pursuant to the federal civil rights statute:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

42 U.S.C. § 1983. Section 1983 "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). To maintain a claim under section 1983, a plaintiff

*February incident*

I.     A § 1983, Fourth Amendment claim of unlawful arrest, asserted against Defendants Drost and Merrill.

II.     A § 1983, Eighth Amendment claim of excessive bail, asserted against Defendant Drost.

III.     A § 1983, Fourteenth Amendment claim of violation of procedural due process, asserted against Defendant Drost.

IV.     A state law false imprisonment claim asserted against Defendants Drost and Merrill.

V.     A state law abuse of process claim asserted against Defendants Drost and Merrill.

VI.     A claim for punitive damages under both federal and state law based on the February 2016 incident.

VII.     A § 1983 claim of supervisory liability against Defendant Ewing, the Town of Orono Police Chief.

VIII.     A § 1983 claim of municipal liability.

*September incident*

IX.     A § 1983, Fourth Amendment claim of unlawful curtilage invasion and questioning against Defendants Morse and Gray.

X.     A § 1983, Fifth and Sixth Amendment claim based on unlawful custodial interrogation, against Defendants Morse and Gray.

XI.     A claim for punitive damages under both federal and state law based on the September 2016 incident.

XII.     A § 1983 claim of supervisory liability against Defendant Ewing.

XIII.     A § 1983 claim of municipal liability.

---

must establish: "1) that the conduct complained of has been committed under color of state law, and 2) that this conduct worked a denial of rights secured by the Constitution or laws of the United States." *Barreto-Rivera v. Medina-Vargas*, 168 F.3d 42, 45 (1st Cir. 1999).  Section 1988 is a jurisdictional provision and also entitles successful civil rights plaintiffs to recover attorney fees.  42 U.S.C. § 1988.

**B.      The February Incident**

Defendants Merrill, Drost, and the Town of Orono argue they are entitled to judgment as to the February incident because the officers had probable cause to arrest Plaintiff for his failure to abide by the terms of the cease harassment notice, (Motion at 5 – 8), because there is no evidence the officers misled the bail commissioner, (*id.* at 12 – 13), and because Plaintiff's 18-hour detention was the product of arrest based on probable cause, which vitiates any due process concern related to bail. (*Id.* at 15 – 18.)   In the alternative, Defendants argue that qualified immunity precludes a recovery.

*1.      The Decision to Arrest*

The Fourth Amendment prohibits unreasonable searches and seizures and provides that no warrant shall issue except on a showing of "probable cause, supported by oath or affirmation." U.S. Const. amend. IV.  An exception to the warrant requirement exists when an officer makes an arrest for a crime committed in the officer's presence.  *Virginia v. Moore*, 553 U.S. 164, 176 (2008).  Maine law similarly permits a law enforcement officer to arrest, without a warrant, "[a]ny person who the officer has probable cause to believe has committed … harassment."   17-A M.R.S. § 15(1)(A)(12).   Harassment includes a "course of conduct with the intent to harass, torment or threaten another person … after having been notified, in writing or otherwise, not to engage in such conduct by … [a] police officer." *Id.* 506-A(1)(A)(1).

Whether an officer had probable cause to arrest is assessed based on the totality of the circumstances and is evaluated based on "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Illinois v.*

*Gates*, 462 U.S. 213, 230 – 31 (1983) (quoting *Brinegar v. United States*, 338 U.S. 160, 175-76 (1949)).  Probable cause for an arrest exists if, "at the time of the arrest, the facts and circumstances known to the arresting officers were sufficient to warrant a prudent person in believing that [the individual] had committed or was committing a crime." *United States v. Torres-Maldonado*, 14 F.3d 95, 105 (1st Cir. 1994).

Plaintiff contends that "nothing compelled" the officers to dispense with a warrant. (Pl's Am. Opp'n at 25, ECF No. 74).  He maintains that whether probable cause existed is a factual question and under the facts of this case, a fact finder could reasonably conclude that Defendants Drost and Merrill improperly arrested him. (*Id.* at 26).

The uncontroverted evidence establishes that prior to the arrest, Plaintiff had been served with a cease harassment notice.  The record also establishes that after service of the notice, Plaintiff repeatedly contacted Ms. Nardone with messages and otherwise engaged in conduct that could reasonably be viewed as harassment in violation of the notice. Contrary to Plaintiff's argument, the record would not reasonably support a finding that the officers lacked probable cause to arrest Plaintiff.

Even if the question of probable cause could be considered debatable, Plaintiff cannot prevail on his claim.  The law is well-established that, "'if the presence of probable cause is arguable or subject to legitimate question, qualified immunity will attach.'" *Wilber v. Curtis*, 872 F.3d 15, 21 (1st Cir. 2017) (quoting *Cox v. Hainey*, 391 F.3d 25, 31 (1st Cir. 2004)).  "[T]he doctrine of qualified immunity provides a safe harbor for a wide range of mistaken judgments." *Hatch v. Dep't for Children, Youth & Their Families*, 274 F.3d 12, 19 (1st Cir. 2001).  "This strain of immunity aspires to 'balance [the] desire to compensate

those whose rights are infringed by state actors with an equally compelling desire to shield public servants from undue interference with the performance of their duties and from threats of liability which, though unfounded, may nevertheless be unbearably disruptive.'" *Cox v. Hainey*, 391 F.3d 25, 29 (1st Cir. 2004) (quoting *Buenrostro v. Collazo*, 973 F.2d 39, 42 (1st Cir. 1992)).  When it comes to allegations of false arrest, qualified immunity shields an officer from suit "if the presence of probable cause is arguable or subject to legitimate question."  *Id.* at 31.  At the very least, Plaintiff's claim that Defendants Drost and Merrill lacked probable cause is "subject to legitimate question."  Accordingly, when this "added measure of protection against civil liability" (i.e., qualified immunity) is considered in relation to the undisputed facts of this case, *id.*, Defendants Drost and Merrill are entitled to summary judgment on Count I.

### 2.      *Interaction with the Bail Commissioner*

Plaintiff alleges Defendant Drost misinformed the bail commissioner about the facts and circumstances of his arrest and thus violated Plaintiff's rights under the Eighth Amendment and/or the Due Process Clause of the Fourteenth Amendment.  (Counts II and III.)  Drost argues the record lacks evidence that would enable a fact finder to conclude that the bail commissioner was provided with false information.  Drost also argues that qualified immunity bars Plaintiff's due process claim because the Eighth Amendment does not require a state to provide bail commissioner services and because the minimal due process requirements were satisfied when a state court judge released Plaintiff on bail on the same day as the arrest.  (Motion at 12 – 15.)  Drost further contends that the due process

claim fails as a matter of law because the legality of detention is determined by reference to the Fourth Amendment.  (*Id.* at 15 – 18.)

The Eighth Amendment prohibits "excessive bail," and the Due Process Clause requires sufficient process before the deprivations of one's liberty.  Plaintiff argues that because the Maine Legislature enacted a bail code that affords access to a bail commissioner, an officer who influences a commissioner's exercise of bail discretion necessarily violates the Constitution if the commissioner denies bail based on inaccurate or misleading information.  (Pl's Am. Opp'n at 42 – 43.)

Plaintiff's argument is unsupported by pertinent legal authority and he has otherwise failed to demonstrate that Defendant Drost's interaction with the bail commissioner implicates a constitutional right.  Even if a constitutional right were implicated, given the lack of legal authority establishing the right, Plaintiff's claim would be barred by the doctrine of qualified immunity.  "The doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Mullenix v. Luna*, 136 S.Ct. 305, 308 (2015) (internal quotations and citations omitted).

To the extent Plaintiff argues that the time he was in custody before his same-day release by a state court judge supports a due process claim, Plaintiff's argument fails.  *See Brady v. Dill*, 187 F.3d 104, 110 – 112 (1st Cir. 1999) (arrest on a valid warrant, of a person soon realized to be innocent; 36-hour detention not a deprivation of liberty without due process).  *See also Wagenmann v. Adams*, 829 F.2d 196, 213 (1st Cir. 1987) ("The jury,

17

having supportably concluded that the police had no colorable basis for detaining the plaintiff, was certainly warranted in finding that bail—in an amount engineered purposefully to guarantee continued confinement—was excessive."); *Thompson v. Olson*, 798 F.2d 552, 556 (1st Cir. 1986) ("[A] police officer's initial finding of probable cause justifies not only arrest, but a reasonable period of continued detention for the purpose of bringing the arrestee before a magistrate."); *Holder v. Town of Newton*, No. 08-CV-197, 2010 WL 432357, at \*12 (D.N.H. Feb. 3, 2010) (collecting cases).

In sum, the record establishes that Plaintiff cannot prevail on Counts II and III.

### 3.    State Law False Arrest/Abuse of Process (Bail)

As a general rule, state law immunity under the Maine Tort Claims Act is coextensive with qualified immunity.  *Comfort v. Town of Pittsfield*, 924 F. Supp. 1219, 1236 (D. Me. 1996) (citing *Jenness v. Nickerson*, 637 A.2d 1152, 1159 (Me. 1994) ("Having found the Officers immune from the section 1983 claims, we also find them immune from claims under the MCRA.").   The Court discerns no legal or factual basis to suggest the general rule should not apply in this case.   Accordingly, Defendants Merrill and Drost are entitled to judgment on the state law claims asserted in Counts IV and V.

## C.    The September Incident

Plaintiff contends that Defendants Morse and Gray violated the Fourth Amendment when they went to his home at night, invaded the curtilage of his home, and disturbed the peace by knocking on the door and window and calling to him, even after he demonstrated he did not intend to come to the door.  Plaintiff also alleges that the officers' invasion of the curtilage at night and their persistent knocking and calling of his name coerced his

participation in a nonconsensual, custodial interrogation.  (Second Am. Compl. Count IX, ¶ 158; Pl.'s Second Amended Opp'n at 42 – 45.)  Plaintiff further alleges the circumstances violated rights protected by the Fifth and Sixth Amendments.  (Second Am. Compl. Count X.)

Defendants Morse and Gray argue that their "knock and talk" activity at Plaintiff's residence was reasonable. (Motion at 21, 25 – 31, 38.) They further argue that Plaintiff was not deprived of rights secured by the Fifth or Sixth Amendment. (*Id.* at 36 – 43.) Defendants also contend that qualified immunity applies because a reasonable police officer would not have known that their conduct violated clearly established constitutional law.  (*Id.* at 31 – 35, 43 – 44.)

### 1. *Fourth Amendment*

#### a.  **Knock and Talk Activity**

"The Fourth Amendment provides in relevant part that the 'right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated.'"  *Collins v. Virginia*, 138 S. Ct. 1663, 1669 (2018).  The Fourth Amendment's protection of personal security is most pronounced when it comes to the home.  *Cf. Florida v. Jardines*, 569 U.S. 1, 6 (2013) ("[W]hen it comes to the Fourth Amendment, the home is first among equals.").  "At the Amendment's 'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'"  *Id.* (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)).

To give full practical effect to the personal right to be secure in one's home, the curtilage of the home – *i.e.*, the area "immediately surrounding and associated with the home'" – is typically treated as "part of the home itself." *Jardines*, 569 U.S. at 6 (quoting *Oliver v. United States*, 466 U.S. 170, 180 (1984)). "The protection afforded the curtilage is essentially a protection of families and personal privacy in an area intimately linked to the home, both physically and psychologically, where privacy expectations are most heightened." *California v. Ciraolo*, 476 U.S. 207, 212–213 (1986). *See also Collins*, 138 S. Ct. at 1670.[10]

Although the curtilage of the home is a protected area, police officers, like ordinary members of the public, are permitted to go to a home and knock to hail occupants. *Kentucky v. King*, 563 U.S. 452, 469 (2011). "The knock and talk rule permits the police to enter onto private land and knock on a citizen's door for legitimate police purposes, such as gathering information in an investigation, without a warrant." *United States v. Smith*, 919 F.3d 1, 6 n.2 (1st Cir. 2019) (modification and quotation marks omitted) (quoting *Young v. Borders*, 850 F.3d 1274, 1284 (11th Cir. 2017)). This is permitted because it is "no more than any private citizen might do." *King*, 563 U.S. at 469. The occupants have no obligation to respond to police who knock, and even if they respond they have no obligation to answer any questions and are free to instruct officers to depart if the officers do not have a warrant. *Id.* "[A] police attempt to 'knock and talk' can become coercive if

---

[10] Whether a particular area associated with home life counts as part of a home's curtilage is determined by a four-factor test: "the proximity of the area … to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." *United States v. Dunn*, 480 U.S. 294, 301 (1987).

the police assert their authority, refuse to leave, or otherwise make the people inside feel they cannot refuse to open up. . . ." *United States v. Spotted Elk*, 548 F.3d 641, 655 (8th Cir. 2008); *see also, Jardines*, 569 U.S. at 7 (inquiring whether officers' conduct constituted "an unlicensed physical intrusion" into the curtilage); *United States v. Carloss*, 818 F.3d 988, 998 (10th Cir. 2016) (inquiring whether the officers "exceeded the implied license they had to approach the house and knock").

Here, Defendants Morse and Gray entered the curtilage on multiple occasions in the early morning hours, knocked on the front door several times, called for Plaintiff to come to the door, knocked on Plaintiff's window, and called out again to Plaintiff, directing him to come to the door.  A fact finder could find that the officers' multiple attempts to persuade Plaintiff to come to the door at an early morning hour, including attempts at a location other than the front door (i.e., a window of the home), to be unreasonable and not within the permissible knock and talk exception to the Fourth Amendment warrant requirement.  The issue is whether, as Defendants argue, qualified immunity precludes Plaintiff's claim.  *See Stamps v. Town of Framingham*, 813 F.3d 27, 39 (1st Cir. 2016) ("we think it close to self-evident that a jury could find as a matter of fact that [the officer's] actions were not reasonable, and no extensive discussion beyond what we have said is required. The question then moves to whether the law was clearly established").

Central to the qualified immunity determination is whether the defendant officers' conduct violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (quoting *Mullenix v. Luna*, 136 S.Ct. 305, 308 (2015)).  When a court considers whether the

constitutional right was clearly established at the time, the court must determine (a) "whether the contours of the right, in general, were sufficiently clear," and (b) "whether, under the specific facts of the case, a reasonable defendant would have understood that he was violating the right." *Ford v. Bender,* 768 F.3d 15, 23 (1st Cir. 2014). Plaintiff contends that in *Florida v. Jardines*, 569 U.S. 1 (2013), the Supreme Court clearly established the limits of constitutionally permissible conduct and that the officers exceeded that limit.

In *Jardines*, a police officer, with information that marijuana was being grown at the defendant's home, approached the home with a drug-sniffing canine, which as it approached the front porch, the dog "apparently sensed one of the odors he had been trained to detect, and began energetically exploring the area for the strongest point of that odor." *Id.* at 3–4. "After sniffing the base of the front door, the dog sat, which is the trained behavior upon discovering the odor's strongest point." *Id.* at 4. The officer relied on the canine's alert to obtain a search warrant for the home. *Id.* The Court invalidated the subsequent search as unreasonable because the drug-sniffing canine intrusion exceeded any license a member of the public might have to enter private property to speak with an occupant, observing that "an officer's leave to gather information is sharply circumscribed when he steps off [public] thoroughfares and enters the Fourth Amendment's protected areas." *Id.* at 7. The Court wrote:

> "A license may be implied from the habits of the country," notwithstanding the "strict rule of the English common law as to entry upon a close." *McKee v. Gratz*, 260 U.S. 127, 136 (1922) (Holmes, J.). We have accordingly recognized that "the knocker on the front door is treated as an invitation or license to attempt an entry, justifying ingress to the home by solicitors, hawkers and peddlers of all kinds." *Breard v. Alexandria*, 341 U.S. 622, 626 (1951). This implicit license typically permits the visitor to approach the

> home by the front path, knock promptly, wait briefly to be received, and then
> (absent invitation to linger longer) leave.  Complying with the terms of that
> traditional invitation does not require fine-grained legal knowledge; it is
> generally managed without incident by the Nation's Girl Scouts and trick-or-
> treaters.  Thus, a police officer not armed with a warrant may approach a
> home and knock, precisely because that is "no more than any private citizen
> might do."  *Kentucky v. King*, 563 U.S. 452, 469 (2011).

*Id.* at 8.  Plaintiff argues that in *Jardines*, the Supreme Court established that whenever a police officer enters on an individual's property without a warrant and without consent of the homeowner to enter, the officer is limited to the conduct expected of girl scouts and trick-or-treaters when they enter someone's property.

Upon review of the facts and analysis in *Jardines*, the Court is not persuaded that *Jardines* clearly established the law that governed the entirety of the officers' conduct in this case.  In *Jardines*, the Supreme Court considered "whether using a drug-sniffing dog on a homeowner's porch to investigate the contents of the home is a 'search' within the meaning of the Fourth Amendment."  *Id.* at 3.  The Supreme Court concluded that "[t]he government's use of trained police dogs to investigate the home and its immediate surroundings is a 'search' within the meaning of the Fourth Amendment."  *Id.* at 11.

Unlike Defendants Morse and Gray, the officer in *Jardines* did not engage in knock and talk activity.  As the Court explained, while an officer without a warrant may approach a home and knock, "introducing a trained dog to explore the area around the home in hopes of discovering incriminating evidence is something else."  *Id.* at 8.  Following *Jardines*, the Supreme Court reiterated that whether a principle constitutes clearly established law "should not be defined by a high degree of generality."  *Pauly*, 137 S. Ct. at 552. (citation and internal quotations omitted).   Instead, "the clearly established law must be

23

particularized to the facts of the case." *Id.* Given that *Jardines* involved an attempt, through use of a drug-sniffing dog, to search for contraband in and around a home and given that *Jardines* did not involve knock and talk circumstances similar to those presented in this case, *Jardines*, did not clearly establish law that is particularized to the facts of this case.

The decisions of other courts in cases with facts more particularized to the facts of this case demonstrate that the law regarding the officers' conduct in this situation was not clearly established.[11] For instance, Plaintiff has relied in part on the time of day that the officers engaged in the knock and talk activity as evidence of a constitutional violation. A review of the decisions reveals that while the time of day is a relevant factor, *see e.g.*, *United States v. Wells*, 648 F.3d 671, 680 (8th Cir. 2011) ("this was no 'pleasant summer evening'—it was 4:00 a.m."); *United States v. Lundin*, 817 F.3d 1151, 1159 (9th Cir. 2016) (the officers knocked "around 4:00 a.m. without evidence that [the defendant] generally accepted visitors at that hour, and without a reason for knocking that a resident would ordinarily accept as sufficiently weighty to justify the disturbance"), the law has not clearly established a time at which knock and talk activity becomes unlawful. *See*, *e.g.*, *Young v. Borders*, 850 F.3d 1274, 1286 (11th Cir. 2017) (Hull, J., concurring) (rejecting the dissent's

---

[11] There is no "hard-and-fast rule" defining what authority from lower courts is sufficient to make a rule clearly established. *El Dia, Inc. v. Governor Rossello*, 165 F.3d 106, 110 n.3 (1st Cir. 1999) ("Among other factors, the location and level of the precedent, its date, its persuasive force, and its level of factual similarity to the facts before this Court may all be pertinent to whether a particular precedent 'clearly establishes' law for the purposes of a qualified immunity analysis"). "The court must examine whether there are cases of controlling authority at the time of the incident or a consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful." *Barton v. Clancy*, 632 F.3d 9, 22 (1st Cir. 2011) (modifications and quotations omitted).

assertion that officers "exceeded the scope of the permissible knock and talk exception because it was 1:30 a.m., he unholstered his weapon, and he knocked so loudly"); *United States v. Rhone*, No. 09-20133-07-JWL, 2015 WL 471205, at *2–3 (D. Kan. Feb. 4, 2015) (rejecting the argument that knock and talks are impermissible late at night).

In addition, Plaintiff's contention that the officers' attempt to contact Plaintiff by knocking at a location other than the front door constitutes a violation in all instances is unconvincing.   Some courts, including the First Circuit, have recognized law enforcement's right to approach a location other than the front door.  *See United States v. Daoust*, 916 F.2d 757, 758 (1st Cir. 1990) (Breyer, J.) (observing that if the front door is not accessible, "there is nothing unlawful or unreasonable about going to the back of the house to look for another door, all as part of a legitimate attempt to interview a person"). Other circuits have similarly condoned knocks at side doors even when a knock at the front door was attempted without success.  The Eleventh Circuit explained:

> Such a minor departure from the front door under these circumstances does not remove the initial entry from the "knock and talk" exception to the warrant requirement. *United States v. Hammett*, 236 F.3d 1054, 1060 (9th Cir. 2001) ("[A police] officer may, in good faith, move away from the front door when seeking to contact the occupants of a residence."); *United States v. Raines*, 243 F.3d 419, 421 (8th Cir. 2001) (recognizing "that law enforcement officers must sometimes move away from the front door when attempting to contact the occupants of a residence"); *United States v. Daoust*, 916 F.2d 757, 758 (1st Cir. 1990) (officer may move away from the front door as part of a legitimate attempt to interview a person); *United States v. Anderson*, 552 F.2d 1296, 1300 (8th Cir. 1977) (officer's movement to rear of house after receiving no answer at front door was lawful).

*United States v. Taylor*, 458 F.3d 1201, 1205 (11th Cir. 2006).

The Supreme Court's decision in *Carroll v. Carman*, 574 U.S. 13 (2014), a knock and talk case decided after *Jardines*, is also instructive.  In *Carroll*, the Supreme Court concluded the defendant officer was entitled to qualified immunity where the officer, in search of an individual believed to be on the plaintiffs' property, walked onto the property, looked in a shed and then approached a sliding glass door on the home, which door opened onto a ground-level deck.  *Id.* at 14, 20.  The Court determined that qualified immunity applied because whether a police officer could conduct a knock and talk at any entrance rather than only the front door was not beyond debate.  *Id.* at 20.  While the decision in *Carroll* is not dispositive because the officer's conduct in *Carroll* occurred before the decision in *Jardines*, the Court did not reference *Jardines* nor otherwise suggest that the debate had been resolved after the officer's conduct.

Whether under the circumstances of this case the officers could knock on what they reasonably believed to be a window to a room in which Plaintiff resided was not beyond debate when the officers attempted to speak with Plaintiff and not any of the other tenants of the building.  Notably, Plaintiff relies exclusively on *Jardines*, which did not address a knock at a door or window, to support his contention that the applicable law was clearly established.  As explained above, the Court is not convinced that *Jardines* clearly established that a police officer in all circumstances could not proceed beyond the front door when engaged in knock and talk activity.  Furthermore, at the time of the officers' conduct, there was only limited out-of-circuit authority as to whether knocking on or looking in a window was permissible in the context of the knock-and-talk exception to the

warrant requirement. *See United States v. Jerez*, 108 F.3d 684, 690–93 (7th Cir. 1997); *United States v. Alicea*, 2015 WL 7460004 (N.D. Iowa, November 24, 2015).

Finally, a review of authority addressing factual situations involving a combination of many of the pertinent factors here—the late hour, multiple attempts, arguable commands, and the departure from the front door[12]—does not reveal a consensus regarding the relevant boundaries of the knock and talk exception to the warrant requirement. *Compare United States v. Reeves*, 524 F.3d 1161, 1169 (10th Cir. 2008) ("A reasonable person faced with several police officers consistently knocking and yelling at their door [and window] for twenty minutes in the early morning hours would not feel free to ignore the officers' implicit command to open the door") *with United States v. Walker*, 799 F.3d 1361, 1364 (11th Cir. 2015) (officers did not exceed the scope of the knock and talk license when they approach a carport at about 5:00 a.m., on a third attempt to speak with the homeowner that night/morning, and tapped on the window of the vehicle to ask the occupant to step out); *Brennan v. Dawson*, 752 F. App'x 276, 279–83, 85–86 (6th Cir. 2018) (officer violated Fourth Amendment but it was not clearly established in 2015 that

---

[12] Plaintiff also cites the alleged loudness of the knocks, but that factor might be less important. In a related context, in *Kentucky v. King*, officers entered an apartment building's public area and "banged" on the door of a suspect's apartment "as loud as they could," while also announcing they were police. *Id.* at 471. When the officers heard activity within the apartment that sounded like efforts to dispose of evidence, they forced their way into the apartment. *Id.* The Court held that the loud knock and announcement did not offend the Constitution and observed that "officers may have a very good reason to announce their presence loudly and to knock on the door with some force." *Id.* at 468. The Court noted that it would be a "nebulous and impractical" standard to expect judges to evaluate the reasonableness of knock and announce activity based on volume. *Id.* at 468 – 69. *See also United States v. Banks*, 540 U.S. 31, 33 (2003) (police "rapped hard enough on the door to be heard by officers at the back door" and announced their presence, but defendant "was in the shower and testified that he heard nothing"). Similar concerns about assessing the volume of police knocks and statements in the context of the knock-and-announce rule and the police-created-exigencies rule also might apply to the knock and talk.

officer did not have license to leave front door to knock on windows, activate sirens and overhead lights, and obstruct a home security camera in an effort to get occupants to answer the door).[13]

Given the multitude of relevant factors and the differing authority, at the time of the officers' conduct in 2016, there was not "a consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful." *Barton*, 632 F.3d at 22. Accordingly, the reasonableness and thus the legality of the knock and talk activity here was at least debatable. Qualified immunity, therefore, applies. *Mlodzinski v. Lewis*, 648 F.3d 24, 36 (1st Cir. 2011) (officers are entitled to immunity where reasonableness of activity governed by the Fourth Amendment is "debatable among reasonable officers").

### b. Interaction with Plaintiff

Plaintiff also contends the officers' conduct effectively compelled him to participate in a nonconsensual police interview. He argues the officers commanded his presence and acted in a way that conveyed the intent to force entry if he did not appear. (Pl.'s Second Am. Opp'n at 47 – 48.) Plaintiff further argues that after he appeared, he was subjected to an unreasonable custodial seizure and interrogation in violation of the Fourth Amendment. (Pl.'s Second Amended Opp'n at 50).

---

[13] The Sixth Circuit's application of the qualified immunity analysis to the knock and talk exception in similar circumstances is also indicative of the somewhat uncertain, rather than clearly established, law because the Sixth Circuit more recently declined to follow *Brennan*, referencing it as an unpublished opinion that was not binding, and determining that *Jardines* clearly established that officers could not leave the front door to enter further into the curtilage if occupants did not answer. *Watson v. Pearson*, 928 F.3d 507, 513 (6th Cir. 2019).

Under the Fourth Amendment, Plaintiff had the right to be secure in his house against unreasonable seizure, and that right protects against not only physical intrusion, but also psychological intrusion. *Ciraolo*, 476 U.S. at 212–213. The home is "first among equals,"[14] *Jardines*, 569 U.S. at 6, and the Supreme Court has recognized that intrusive interviews, such as those associated with *Terry* stops, qualify as "seizures" for purposes of the Fourth Amendment, even when they transpire in the public square, *Terry v. Ohio*, 392 U.S. 1 (1968), or involve a traffic stop, *United States v. Brignoni-Ponce*, 422 U.S. 873, 881 (1975).

Initially, the issue is whether the "seizure" of Plaintiff on his porch was reasonable under the circumstances. *Terry*, 392 U.S. at 19 ("[T]he central inquiry under the Fourth Amendment [is] the reasonableness in all the circumstances of the particular government invasion of a citizen's personal security."); *see also Ashcroft v. al-Kidd*, 563 U.S. 731, 736 (2011) ("Fourth Amendment reasonableness is predominantly an objective inquiry. We ask whether the circumstances, viewed objectively, justify the challenged action. If so, that action was reasonable whatever the subjective intent motivating the relevant officials." (quotation marks, brackets and citation omitted)); *Brignoni-Ponce*, 422 U.S. at 878 ("As with other categories of police action subject to Fourth Amendment constraints, the reasonableness of such seizures depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers").

---

[14] "[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *United States v. United States District Court*, 407 U.S. 297, 313 (1972). There was no entry in this case.

Reasonableness is ordinarily a question for the finder of fact at trial, but the qualified immunity doctrine protects officers from liability where the reasonableness of certain conduct is debatable under the specific circumstances of the case at hand. *City of Escondido*, *Cal. v. Emmons*, 139 S. Ct. 500, 503 (2019); *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 – 53 (2018). For the reasons explained above, the reasonableness of the initial search or seizure is at least debatable and therefore will not support Plaintiff's claim. In addition, Morse and Gray did not search further or create any additional restrictions on Plaintiff's liberty until after Plaintiff stated he would go in his house and get the phone (Plaintiff's Affidavit ¶ 125, ECF No. 54), which statement provided the officers with additional support for probable cause to detain Plaintiff. *See United States v. Johnson*, 107 F. App'x 674, 677–78 (7th Cir. 2004) (knock and talk did not create a seizure but preventing suspect from retreating into the home was a seizure requiring suspicion to stop the suspect). The reasonableness of the subsequent conduct of Defendants Morse and Gray is at least debatable and does not entitle Plaintiff to relief.

### 2.      *Fifth and Sixth Amendments*

Plaintiff also asserts his rights under the Fifth and Sixth Amendments. Plaintiff argues, "[u]nder these circumstances, Plaintiff's Fifth Amendment claim lies and, if not, a Fifth Amendment claim lies under the Fourth Amendment." (Plaintiff's Second Amended Opposition at 50.) The Fifth Amendment protects Plaintiff from being "compelled in any criminal case to be a witness against himself." U.S. Const. amend. 5. Plaintiff was never compelled to be a witness against himself in any criminal case; Plaintiff's Fifth Amendment claim thus fails. *United States v. Patane*, 542 U.S. 630, 641 (2004) ("[P]olice

do not violate a suspect's constitutional rights (or the *Miranda* rule) by negligent or even deliberate failures to provide the suspect with the full panoply of warnings prescribed by *Miranda*.   Potential violations occur, if at all, only upon the admission of unwarned statements into evidence at trial"); *Chavez v. Martinez*, 538 U.S. 760, 767 (2003) ("Statements compelled by police interrogations of course may not be used against a defendant at trial, but it is not until their use in a criminal case that a violation of the Self-Incrimination Clause occurs ….") (citations omitted).

To the extent that Plaintiff contends the custodial interrogation violated his Sixth Amendment right to counsel, he "has no cause of action under 42 U.S.C. § 1983 because he has not and cannot show that he was prejudiced by having been questioned without his counsel present" because he "was not subjected to a criminal trial." *Pasdon v. City of Peabody*, 417 F.3d 225, 228 (1st Cir. 2005).

### 3.   *State Law Claim for the September Incident*

Plaintiff asks for relief under federal and state law, but he has not alleged in his Second Amended Complaint (ECF No. 6) or in his summary judgment filings a state law claim concerning the September incident.   To the extent that Plaintiff's filings can be construed to assert a state law claim for false arrest or imprisonment based on the arguable custodial interrogation, that claim lacks merit because even if the restraint effectively amounted to a short period of custody, the officers had immunity under state law.   *See e.g.*, *Leach v. Betters*, 599 A.2d 424, 426 (Me. 1991) (officers have immunity when performing discretionary functions like "making a warrantless arrest" unless officers' conduct is not merely "mistaken" but is "wanton or oppressive").

**D.      Supervisory and Municipal Claims**

In Counts VII, VIII, XII, and XIII, Plaintiff claims Defendant Ewing, the Town of Orono's chief of police, and the Town of Orono are liable for the deprivation of his constitutional rights because they failed to train or supervise the officers or because established a municipal custom, policy, or practice that caused the deprivation of his rights. Defendants argue the record does not support the claims.  (Motion at 45 – 48.)

First, because Plaintiff cannot establish the liability of the individual officers, Plaintiff cannot prevail on his supervisory liability claim.  *Pineda v. Toomey*, 533 F.3d 50, 54 (1st Cir. 2008) (a supervisory official may be liable for the conduct of a subordinate "only if" the conduct of the subordinate results in a constitutional violation and the supervisor encouraged, condoned or acquiesced in the conduct.)  Furthermore, Defendant Ewing is entitled to summary judgment because the record lacks any facts that would support a finding that he was involved in either of the incidents or that he encouraged, condoned, or acquiesced in the conduct.  *See Maldonado v. Fontanes*, 568 F.3d 263, 274– 75 (1st Cir. 2009).

Similarly, the Town of Orono is entitled to summary judgment on the municipal liability claim.  Municipal liability exists when the evidence demonstrates that a constitutional violation is directly attributable to official municipal policy.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978); *Massó-Torrellas v. Municipality of Toa Alta*, 845 F.3d 461, 468 (1st Cir. 2017); *Kennedy v. Town of Billerica*, 617 F.3d 520, 531–32 (1st Cir. 2010).  The record lacks evidence that would permit the fact finder to find that the Town of Orono maintained a policy that led to a violation of Plaintiff's rights.

Finally, although in his opposition to the motion Plaintiff notes that the case includes claims against the officers' "superiors," the factual record does not support a claim of either municipal liability or supervisory liability.

In sum, Defendants are entitled to summary judgment on Plaintiff's supervisory claims (Counts VII, VIII, XII, and XIII).

**E.     Punitive Damages**

Plaintiff cannot recover punitive damages (Counts VI and XI) given that he cannot prevail on his substantive claims.

**CONCLUSION**

Based on the foregoing analysis, the Court grants Defendants' motion for summary judgment.  Judgment shall enter in favor of Defendants on all counts.


                                                    /s/ John C. Nivison
Dated this 4th day of June, 2020.          U.S. Magistrate Judge